T.C. Memo. 2003-296

UNITED STATES TAX COURT

DONALD L. WALFORD, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 6506-86.          Filed October 23, 2003.

Donald L. Walford, pro se.

<u>Pamela J. Sewell</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, <u>Judge</u>:  Respondent determined the following deficiencies in and additions to petitioner's Federal income taxes:

| | | Additions to Tax | |
|------|------------|------------------|------------------|
| <u>Year</u> | <u>Deficiency</u> | <u>Sec. 6651(a)(1)</u> | <u>Sec. 6659(a)</u> |
| 1980 | $28,252.46 | --- | --- |
| 1981 | 9,478.52 | $521.88 | $2,843.55 |

Respondent also determined that the increased rate of interest under section 6621(d) applied.[1] The issues in this case arise from petitioner's involvement in a partnership that was to acquire an energy management system to be installed in a manufacturing plant.

After concessions,[2] we must decide: (1) Whether petitioner is entitled to a deduction of $18,956 related to his limited partnership interest in Sav-Fuel Associates for the taxable year 1981; (2) whether petitioner is liable for an addition to tax pursuant to section 6659 of $2,843.55 for the taxable year 1981; and (3) whether petitioner is liable for the increased rate of interest under section 6621(d). We hold that petitioner is not entitled to the claimed deduction for 1981 because the partnership he invested in was an activity not engaged in for profit within the meaning of section 183. Additionally, we hold that there was an underpayment of tax of at least $1,000 that was attributable to a valuation overstatement and that increased interest applies.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Subsequent dollar amounts are rounded.

[2]Respondent concedes that the adjustments to petitioner's 1980 Federal income tax return are barred by the statute of limitations under sec. 6501. Petitioner concedes that he is liable for the addition to tax under sec. 6651(a)(1) on any deficiency decided by the Court for the taxable year 1981.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, the supplemental stipulation of facts, the stipulation of settled issues, and the attached exhibits are incorporated herein by this reference. Petitioner resided in Boulder, Colorado, at the time he filed his petition.

In 1980, petitioner invested in Sav-Fuel Associates (Sav-Fuel), a Connecticut limited partnership.[3] During the years in issue, petitioner, as a limited partner, had a 2.152174-percent interest in the profits and losses of Sav-Fuel. The sole general partner of Sav-Fuel was Winston Frost (Mr. Frost), who held a 1-percent interest in the profits and losses of the partnership. A private placement memorandum (PPM) for Sav-Fuel was distributed to potential investors.

The stated purpose of Sav-Fuel was to acquire an energy management system (EMS) to be installed in the manufacturing plant of Gould, Inc. (Gould), located in El Monte, California. The EMS was to include master controllers, control modules, heat exchangers, fans, valve controls, an automated lighting control system, and other devices and controls. The stated function of the EMS was to provide a technologically advanced yet simple and

---

[3]The evidence in the record indicates that Sav-Fuel was formed on July 1, 1980.

efficient method of energy management to factories, residential, commercial, motel and hotel facilities.

Sav-Fuel was to purchase the EMS from Nisona Energy Corp. (Nisona) sometime around November 1980. Pursuant to a purchase agreement, Sav-Fuel was to pay to Nisona a total purchase price of $10,350,000 for the EMS. The terms of payment included: (1) Payment of $1,058,000 due at closing; (2) a full recourse note of $287,500, bearing no interest, due on February 28, 1981; and (3) a nonrecourse note of $9,004,500, bearing an annual interest rate of 9 percent, due on November 30, 2005. The nonrecourse note was payable solely from 80 percent of the gross income actually received by Sav-Fuel from the use of the EMS. The PPM does not state that Sav-Fuel held any asset other than the EMS, and there is no evidence in the record that Sav-Fuel owned other assets. The PPM states no other activity for Sav-Fuel than the operations at issue.

The PPM states that pursuant to a purchase agreement Nisona purchased the EMS from Dard Systems, Inc. (Dard), earlier in 1980 for a total purchase price of $9,342,000. Dard was a Delaware corporation organized in 1980. The terms of payment included: (1) Payment of $337,500 due at closing; and (2) a nonrecourse note of $9,004,500, bearing an annual interest rate of 9 percent, due on November 30, 2005. The PPM states that the nonrecourse note given by Sav-Fuel to Nisona would be assigned by Nisona to

Dard as collateral for Nisona's nonrecourse note.  The PPM further states that Dard purchased the EMS for $337,500 in 1980 from Consumer Energy Funding, Inc. (CEF), an unrelated party. According to the PPM, CEF was organized in 1980 and had limited experience in the field of energy management and in the care or supervision of systems similar to the one being acquired by Sav-Fuel.

The PPM states that CEF entered into a user agreement with Gould dated September 30, 1980.  CEF was to operate and service the energy management equipment to be installed at the Gould manufacturing plant.  Under the user agreement between CEF and Gould, Gould was to pay CEF 50 percent of the gross energy savings realized from the use of the energy management equipment.

Sav-Fuel was to enter into a management agreement with CEF sometime around November 1980.  Pursuant to the agreement, CEF was to install and manage the EMS in exchange for certain management fees.  CEF was to retain 15 percent of the amount received from Gould and was to remit the remaining 85 percent to Sav-Fuel.  Taking into account Sav-Fuel's obligation to Nisona, Sav-Fuel was to be entitled to 8.5 percent of any savings generated by the EMS.  It is unknown whether the EMS was installed at Gould's manufacturing plant and whether it ever produced substantial energy savings.

Sav-Fuel was promoted by Mr. Frost, Richard Gangel (Mr. Gangel), David Dworsky (Mr. Dworsky), Nisona, and Dard. The promoters have entered into other partnerships that have attempted to sell and/or commercially exploit computerized energy management systems similar to that of Sav-Fuel.[4] At the time of the offering, Nisona was recently organized and had minimal experience in the sale of computerized energy management systems. Mr. Gangel (and/or trusts on behalf of his family) owned Nisona. Execusport, Inc.,[5] and Mr. Gangel (and/or trusts on behalf of Mr. Gangel's family) equally controlled Dard. Mr. Frost had acted as a general partner in other partnerships that had purchased similar energy management systems from entities affiliated with Nisona and Mr. Gangel. At the time of the offering, Mr. Dworsky was the president and sole shareholder of CEF.

The promoters distributed the PPM to potential investors. The PPM states that the offering consists of 23 units of limited partnership interests each requiring a cash payment of $49,900 on the purchase of an interest[6] and the balance of $12,500 by a full

---

[4]Another EMS-related activity involving Mr. Frost was the subject of Gianaris v. Commissioner, T.C. Memo. 1992-642.

[5]The record does not indicate whether any of the promoters were affiliated with Execusport, Inc.

[6]Assuming all 23 units were sold to investors, the total of the initial cash payments of $49,900 equaled $1,147,700. Of this amount, $55,200 was intended for legal costs, $13,800 was for compensation of Mr. Frost, and $20,700 was for working capital.

recourse promissory note due January 31, 1981.[7]  The PPM states in multiple places that the offering involves a high degree of risk and should be considered only by investors who can afford to lose their entire investment.  Each prospective investor in Sav-Fuel was required to show that he had a net worth (excluding home, home furnishings, and automobiles) of at least $250,000 and one-half of his annual income would be subject to tax in the 49-percent or higher tax bracket.

The PPM contains assumptions and projections of economic consequences for the years 1980 to 2005.  The PPM made the following assumptions:  (1) Total cash contributed by the partners would be $1,380,000; (2) Gould consumed 11,011,620 kilowatt hours of electricity and 20,664 units of kilowatt demand at a total cost of $565,761 for the 12-month period beginning August 1979 through July 1980; (3) the useful life of the EMS would be 25 years; (4) the estimated reduction in fuel consumed by Gould would be 20 percent per year; (5) as a result of the 20 percent estimated reduction, Gould would save $135,000 annually and Sav-Fuel would receive 50 percent, or $67,500, of this amount before payment of the 15-percent management fee to CEF; and (6) the inflation in energy costs was 20 percent per year.  On the

---

[7]Assuming all 23 units were sold to investors, the total of the $12,500 payments required by Jan. 31, 1981, equals $287,500, the same amount as the recourse note due from Sav-Fuel to Nisona on Feb. 28, 1981.

basis of these assumptions, the economic projections show a net cashflow of $2,453,398. The income projections in the PPM are not discounted to present value.

According to the PPM, depreciation on the EMS was expected to total $1,478,571 for 1980. This was based on Sav-Fuel's use of the Class Life Asset Depreciation Range method to depreciate the EMS on a double declining basis over 7 years. The PPM also states that the partnership anticipated approximately $2,070,000 in 1980 for investment tax credits and energy credits.

The PPM states that to the extent that fuel prices do not continue to increase through 2005 at the rate projected, Sav-Fuel will be unable to achieve the gross income and return to its limited partners as set forth in its economic projections. The PPM also recognizes that the development of new processes or technology could result in the possible obsolescence of the EMS.

Over 30 of the past 35 years, petitioner has worked as a stockbroker and investment banker. At the time of his investment in Sav-Fuel, petitioner had no knowledge of the partnership other than that obtained from reviewing the PPM. Petitioner has no personal knowledge of the EMS.

Petitioner and his former wife's jointly filed 1981 Federal income tax return was mailed to respondent on March 11, 1983. On the return, petitioner claimed a deduction of $18,956, his distributive share of the partnership losses from Sav-Fuel. The

claimed deduction was based on the depreciation of the EMS.  By notice of deficiency, respondent disallowed the claimed deduction, determined that petitioner was liable for additions to tax under sections 6651(a)(1) and 6659(a), and determined that increased interest applied under section 6621(d) because the 1981 deficiency was a substantial underpayment attributable to a tax-motivated transaction.  Petitioner timely filed a petition to this Court seeking a redetermination.

OPINION

The primary issue for decision is whether petitioner is entitled to deduct the loss attributable to his investment in Sav-Fuel.  Deductions are a matter of legislative grace, and the taxpayer bears the burden of establishing the entitlement to any deduction claimed.[8]  INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).  In order to satisfy this burden, petitioner must establish that the EMS-related activity was engaged in for profit within the meaning of section 183.

---

[8]Sec. 7491, which is effective for court proceedings arising in connection with examinations commencing after July 22, 1998, provides rules that shift the burden of proof to the Commissioner in certain circumstances and place on the Commissioner the burden of production with respect to penalties and additions to tax. Sec. 7491 is inapplicable to this case because the examination began before July 23, 1998.

I.    <u>Profit Motive</u>

Section 183(a) generally disallows deductions attributable to activities not engaged in for profit.  The Court of Appeals for the Tenth Circuit, to which an appeal in this case would normally lie, has stated that the proper test for determining the required profit motive is whether "profit was the dominant or primary objective of the venture."  <u>Hildebrand v. Commissioner</u>, 28 F.3d 1024, 1027 (10th Cir. 1994), affg. <u>Krause v. Commissioner</u>, 99 T.C. 132 (1992); see also <u>Keeler v. Commissioner</u>, 243 F.3d 1212, 1220 (10th Cir. 2001), affg. <u>Leema Enters., Inc. v. Commissioner</u>, T.C. Memo. 1999-18.  Whether an activity was engaged in for profit is a factual determination to be resolved on the basis of all the surrounding facts and circumstances.  <u>Hildebrand v. Commissioner</u>, <u>supra</u> at 1026; <u>Finoli v. Commissioner</u>, 86 T.C. 697, 722 (1986).

The taxpayer's objective must be to achieve an economic profit independent of tax considerations.  <u>Hulter v. Commissioner</u>, 91 T.C. 371, 393 (1988); <u>Gianaris v. Commissioner</u>, T.C. Memo. 1992-642.  Because petitioner is claiming his deduction through a partnership, the profit objective is determined at the partnership level.  <u>Cannon v. Commissioner</u>, 949 F.2d 345, 349 (10th Cir. 1991), affg. T.C. Memo. 1990-148; <u>Hulter v. Commissioner</u>, <u>supra</u> at 393; <u>Brannen v. Commissioner</u>, 78 T.C. 471, 505 (1982), affd. 722 F.2d 695 (11th Cir. 1984).  In making

the determination, we generally look to the actions and expertise of the promoters and the general partner of the partnership. Peat Oil & Gas Associates v. Commissioner, 100 T.C. 271, 276 (1993); Hulter v. Commissioner, supra at 393; Fox v. Commissioner, 80 T.C. 972, 1007-1008 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984); Gianaris v. Commissioner, supra.

As explained below, there are several reasons to support our holding that the EMS-related activity was not engaged in with a dominant or primary objective of making a profit. These include: (1) The grossly inflated sale price of the EMS; (2) the lack of profit objective reflected by the actions and lack of expertise of the promoters and general partner of Sav-Fuel; and (3) the lack of a profit objective under the factors contained in section 1.183(a)-2, Income Tax Regs. Additionally, applying the approach used in Gianaris v. Commissioner, supra, we find that there was no reasonable possibility of a profit independent of tax considerations because the discounted cashflows (disregarding tax considerations) would have been negative. We explain our findings in detail below.

A.  Sale Price of EMS

A hallmark of an economically distorted tax shelter is a purported transfer of ownership at a grossly inflated sale price. Soriano v. Commissioner, 90 T.C. 44, 54 (1988). Generally, the

purchaser makes a small cash payment and executes a nonrecourse note for the remaining purchase price. Id. In this type of situation, the transaction is so economically infeasible or lacking in economic substance that the investor's primary or sole motivation for entering into the transaction is the tax benefits (e.g., artificially inflated depreciation deductions and investment tax credits). Id. The fair market value of the underlying asset will not conceivably support the purchase price, and the nonrecourse debt practically ensures that the price will not be paid. Id. For these reasons, prior opinions of this Court and of other courts have focused on fair market value of the property and the character of financing for purposes of evaluating profit objective. Id.; Rose v. Commissioner, 88 T.C. 386, 412-414 (1987), affd. 868 F.2d 851 (6th Cir. 1989).

Fair market value is the price that would be reached by a willing buyer and willing seller where neither is under any compulsion to buy or sell. Chiu v. Commissioner, 84 T.C. 722, 730 (1985); Gianaris v. Commissioner, supra. Previous sales of the same property without subsequent events affecting value are generally strong indicators of fair market value. Tripp v. Commissioner, 337 F.2d 432, 434-435 (7th Cir. 1964), affg. T.C. Memo. 1963-244; Chiu v. Commissioner, supra at 734-735; Estate of Scull v. Commissioner, T.C. Memo. 1994-211; Brigham v. Commissioner, T.C. Memo. 1992-413.

In the instant case, the PPM states that the EMS was purchased by Dard from CEF, an unrelated party, for $337,000 in 1980. That same year, Nisona purchased the EMS from Dard for $9,342,000, and Sav-Fuel purchased the EMS from Nisona for $10,350,000. The price paid by Sav-Fuel for the EMS in 1980 was over 3,000 percent greater than the price paid by Dard for the same property in the same year.[9] There is no evidence in the record and petitioner has offered no explanation as to the massive difference in the purchase price of the EMS. Indeed, petitioner concedes on brief that the price Sav-Fuel paid for the EMS was "excessive" and contends that a more plausible value for the EMS was $5 million. Petitioner testified at trial that he performed his own valuation analysis of the EMS after respondent disallowed the deductions. In making this argument as to the appropriate value of the EMS, petitioner relies on evidence that was not admitted into the record.[10]

It is clear that both Sav-Fuel and Nisona grossly overpaid for the EMS and that these gross overpayments were intentionally

---

[9]10,350,000 ÷ 337,000 = 30.71, or 3,071 percent.

[10]Petitioner attached to his posttrial brief an affidavit from a certified public accountant as to the value of the EMS. However, this affidavit was not previously stipulated or offered and admitted into evidence at trial. Accordingly, petitioner is not entitled to rely on the affidavit as support for his argument. Other than this affidavit, petitioner presented no other documents supporting his valuation of the EMS.

made to achieve grossly inflated tax benefits.[11]  If Sav-Fuel's dominant or primary objective was to achieve a profit, it would not have purchased the EMS at such a grossly inflated price.

The method of financing used in the EMS transactions also indicates that Sav-Fuel lacked the requisite profit objective. In purchasing the EMS, Nisona made a cash payment to Dard of only $337,000 and financed the remainder of the purchase price with a nonrecourse note.  The cash payment neatly coincides with the full price paid to CEF, the unrelated party.  Similarly, Sav-Fuel financed $9,004,500 of the purchase price with a nonrecourse note, which Nisona was to assign to Dard as collateral for its note.  Both notes were not due for 25 years.  The sole source of repayment of the nonrecourse note from Sav-Fuel to Nisona was revenues received by Sav-Fuel from CEF under the management agreement.  These revenues were based on the gross energy savings realized from the use of the energy management equipment. However, it is unclear from the record whether the EMS was actually installed at Gould and whether there were any energy savings.

The evidence in the record reflects that the grossly inflated purchase price and the nature of the nonrecourse

---

[11]Even if we were to accept petitioner's unsupported valuation for the EMS of $5 million, this amount is still almost 1,500 percent greater than the price paid by Dard to CEF for the EMS (5,000,000 ÷ 337,000 = 14.84, or 1,484 percent).

financing used in this case were means of ensuring that Sav-Fuel would generate artificially inflated tax benefits while at the same time virtually assuring that it would never repay the note in full.  This leads to the logical conclusion that the EMS-related activity was entered into primarily or solely for tax benefits, and not with the dominant or primary objective of making a profit.

B.    Actions and Expertise of Promoters and General Partner of Sav-Fuel

The promoters of Sav-Fuel were Messrs. Frost, Dworsky, and Gangel and the corporations Nisona and Dard.  Mr. Frost, who is deceased, was also the general partner of Sav-Fuel.  Mr. Dworsky was the president and sole shareholder of CEF, the company responsible for maintaining and managing the EMS.

Neither Mr. Dworsky nor Mr. Gangel nor any representatives of Dard or Nisona testified at trial to explain the purpose of the EMS-related activity of Sav-Fuel.  We have previously noted that the failure to introduce the testimony of available witnesses who purportedly possess knowledge about certain relevant facts provides a sufficient basis to infer that the testimony of those witnesses would not have been favorable.  See, e.g., Petzoldt v. Commissioner, 92 T.C. 661, 691 (1989); Pollack v. Commissioner, 47 T.C. 92, 108 (1966), affd. 392 F.2d 409 (5th Cir. 1968); Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947); Medlin v.

<u>Commissioner</u>, T.C. Memo. 2003-224. The evidence in the record does not support a finding that the actions and expertise of the promoters were consistent with the profit objective required under section 183.

  C. <u>Objective Factors Listed in the Regulations</u>

  Section 1.183-2(b), Income Tax Regs., sets forth a list of nine nonexclusive factors to be considered in determining whether an activity was engaged in for profit: (1) The extent to which the taxpayer carries on the activity in a businesslike manner; (2) the taxpayer's expertise or reliance on the advice of experts; (3) the time and effort the taxpayer expends in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the taxpayer's success in similar activities; (6) the taxpayer's history of income or loss from the activity; (7) the amount of occasional profits, if any; (8) the taxpayer's financial status; and (9) the elements of personal pleasure or recreation. Not all of these factors are applicable in every case, and no one factor is controlling. <u>Id.</u> Because not all the factors are applicable in this case, we will not enter into a detailed analysis of each factor; rather, we briefly address why application of the relevant factors further supports a finding that Sav-Fuel lacked the requisite profit motive.

The evidence in the record does not support a finding that Sav-Fuel was operated in a businesslike manner. Other than the PPM, no books, records, or financial statements for Sav-Fuel were offered into evidence by petitioner, and it is unclear whether any existed. Petitioner contends he believes that the EMS was installed at Gould's manufacturing plant and produced substantial energy savings, but he is not sure. There is no evidence in the record that Messrs. Frost and Gangel had any previous involvement with energy savings activities other than the similar EMS tax shelters in Gianaris v. Commissioner, T.C. Memo. 1992-642, and Gangel v. Commissioner, T.C. Memo. 1991-358.

There is no evidence indicating how much time and effort was expended in carrying on the EMS-related activity. The evidence in the record does not demonstrate that it was reasonably expected that the EMS would appreciate in value, and as previously discussed, the record indicates that the purchase price for the EMS was grossly inflated. There is no evidence that Sav-Fuel had any previous experience in similar activities. Indeed, like Nisona and Dard, Sav-Fuel was formed only shortly before the purported transactions occurred. There is no evidence that Sav-Fuel ever earned profits from the EMS-related activity. The above facts again demonstrate that the requisite profit objective was lacking.

On brief, petitioner implies that the relevant inquiry is whether he had the requisite profit objective.  As explained earlier, in the partnership context, the determination of profit objective is made at the partnership level.  Cannon v. Commissioner, 949 F.2d at 349; Hulter v. Commissioner, 91 T.C. at 393; Brannen v. Commissioner, 78 T.C. at 505.  However, the result would be the same even if the profit objective was examined from petitioner's standpoint.  The evidence in the record reflects that petitioner, an experienced investor, did not take the time to do an independent investigation of the assumptions contained in the PPM or otherwise take any action to verify the profitability of the EMS-related activity.  The parties stipulated that at the time of his investment in Sav-Fuel, petitioner had no knowledge of the partnership other than the information he obtained from review of the PPM.  At trial, petitioner admitted that he did not perform an independent valuation analysis of the EMS until after he learned that respondent had disallowed his claimed deductions.  On the basis of petitioner's failure to undertake these steps, we find it implausible that he had the dominant or primary objective of making a profit.

D.  Present Value Analysis

Although we have already found that Sav-Fuel was not engaged in the EMS-related activity for profit and therefore petitioner

is not entitled to the claimed deductions, we explain why applying an economic analysis based on the projected future cashflows of the partnership further supports our finding.  We have previously used a present value analysis in similar situations to determine whether an activity was engaged in for profit within the meaning of section 183.  See Soriano v. Commissioner, 90 T.C. at 54-57; Gianaris v. Commissioner, supra; Keenan v. Commissioner, T.C. Memo. 1989-300.

For example, in Gianaris, we examined the economic projections and income assumptions of a partnership engaged in a similar EMS-related activity and found that there was no reasonable possibility of a profit independent of tax considerations because the discounted cashflows (disregarding tax considerations) would have been negative.  We explained the use of a present value analysis to determine profit objective as follows:

> Generally, a financial investment will require one or more cash payments and will produce one or more cash returns.  Net present value (net cash-flow) is the sum of the initial investment (a negative cash-flow) plus the present values of future cash-flows (which may be either negative or positive).  If net present value is positive, the investment is profitable, and a profit-seeking investor would pursue it.  If net present value is zero, the investment is neither profitable nor unprofitable, and a profit-seeking investor would be indifferent to it.  If net present value is negative, the investment is unprofitable, and a profit-seeking investor would avoid it. [Id.; fn. refs. omitted.]

Petitioner is aware of the approach used in Gianaris; however, he contends that the result in this case differs because the economic projections demonstrate that the requisite profit objective existed. As an initial matter, we emphasize that calculating net present value by using the assumptions and figures from the PPM results in a negative present value after discounting future cashflows by applying the risk-free rate of return (without applying any risk premiums) and disregarding tax considerations. The only way that petitioner can overcome this fact is by manipulating some of the assumptions contained in the PPM, most notably by arguing that the EMS had a longer useful life.

The PPM contains assumptions and projections, some of which the parties do not dispute. Additionally, both parties submitted expert reports in support of their respective positions. While we are not bound by the opinion of any expert witness, we may accept or reject expert testimony, using our own judgment. Helvering v. Natl. Grocery Co., 304 U.S. 282, 295 (1938); Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990). Generally, we disregard expert testimony that states legal conclusions and/or does not assist the Court to understand the evidence or determine a fact in issue. See, e.g., Sunoco, Inc. v. Commissioner, 118 T.C. 181, 183 (2002); Laureys v. Commissioner,

92 T.C. 101, 126-129 (1989); <u>FPL Group, Inc. v. Commissioner</u>, T.C. Memo. 2002-92.

In this case, the figures necessary for the present value analysis include:  (1) The initial cash expenditure; (2) the annual energy bill of Gould, the end user of the EMS; (3) the useful life of the EMS; (4) the anticipated energy savings; (5) the inflation of energy costs; and (6) the appropriate discount rate.  See, e.g., <u>Soriano v. Commissioner</u>, <u>supra</u> at 55.  These figures are then used in the present value analysis described in <u>Gianaris</u> to arrive at the net present value of the investment in Sav-Fuel.  For the reasons set forth below, after examining the expert reports and other evidence in the record and assuming certain figures most favorable to petitioner, we conclude that the results confirm that Sav-Fuel lacked any reasonable possibility of a profit independent of tax considerations because its discounted cashflows (disregarding tax considerations) would have been negative.

1.  <u>Cash Expenditure</u>

The PPM states that Sav-Fuel was offering 23 limited partnership units at a cost of $62,400 per unit.  Investors were required to contribute $49,900 of the cost in 1980 and $12,500 in 1981.  For each unit sold, $2,400 was designated as payment of legal costs.  Therefore, the total cash received by Sav-Fuel for investment was intended to be $1,380,000.  Of this amount,

$1,092,500 was to be received by Sav-Fuel in 1980 and $287,500 was to be received in 1981.

### 2. Annual Energy Bill of CEF

The PPM assumed that Gould consumed 11,011,620 kilowatt hours of electricity and 20,664 units of kilowatt demand at a total cost of $565,761 for the 12-month period August 1979 through July 1980. These figures are important for purposes of determining the projected annual income of Sav-Fuel on the basis of the amount of annual energy savings by Gould. Neither party has disputed these assumptions and, applying these assumptions, both parties' experts arrived at approximately the same amount of projected income for the period 1980 through 2005.

### 3. Useful Life of the EMS

The economic projections in the PPM assume a useful life of 25 years. Respondent assumes arguendo that the EMS had a useful life of 25 years. Petitioner contends that the EMS had a useful life exceeding 30 years and submitted different projections using a useful life of 26 to 30 years.

Petitioner relies on the report and testimony of Michael Jinnette (Mr. Jinnette) for purposes of establishing the useful life of the EMS. Mr. Jinnette earned a bachelor of education degree from Colorado State University in 1973 and took some computer science courses while attending the university. After graduation, Mr. Jinnette taught vocational electronics and

computer science courses at the Community College of Denver for 5 years and then worked as a software development engineer until 1984. Mr. Jinnette currently builds software that communicates with energy meters and building controllers, and he claims to be familiar with the design, installation, and maintenance of various energy management systems and their related software and hardware components.[12]

The stated purpose of Mr. Jinnette's report was to provide his opinion on the reasonable lifespan of commercial grade energy management equipment such as the equipment described in the Sav-Fuel PPM. However, other than a paragraph setting forth Mr. Jinnette's qualifications, the report contains only two short paragraphs setting forth the basis for his opinion and conclusion. The report states that Mr. Jinnette has personal knowledge of energy management equipment similar to that described in the Sav-Fuel PPM and that he gained this knowledge through his personal involvement in the installation and maintenance of software for equipment of a similar age and type. On the basis of this personal knowledge, Mr. Jinnette opines that "it is reasonable to assume that, if properly maintained, energy management equipment of a type and function similar to that described in the Sav Fuel PPM would remain operational for a

---

[12]At trial, the Court qualified Mr. Jinnette as an expert for purposes of assisting the Court to understand the nature of the energy management equipment.

period exceeding thirty (30) years at a minimum." The report contains no other facts or data showing the basis for Mr. Jinnette's opinion.[13]

At trial, Mr. Jinnette testified that he currently works with similar equipment and that he recently worked on equipment that was installed in the early 1980s. He furthered testified that the type of equipment at issue is industrial grade equipment designed to last for 20 to 30 years, and it typically does if it is properly maintained. These were the only reasons Mr. Jinnette gave as the basis for his opinion that the useful life of the EMS exceeded 30 years.

We are not persuaded by Mr. Jinnette's report and his opinion that the useful life of the EMS purchased by Sav-Fuel exceeded 30 years. Mr. Jinnette cited no authority, facts, or data, other than his personal belief, to establish the useful life of the EMS. His testimony at trial did not provide a sufficient basis for the conclusion reached in his report. Mr.

---

[13]Under Rule 143(f)(1), expert reports are required to state the witness's opinion and the facts or data on which the opinion is based and must set forth in detail the reasons for the conclusion. Additional direct testimony with respect to the report may be allowed to clarify or emphasize matters in the report, to cover matters arising after the preparation of the report, or otherwise at the discretion of the Court. Id. At trial, the Court told petitioner that Mr. Jinnette's report basically stated his opinion without providing an explanation as to how the conclusion was reached and suggested that petitioner elicit more information with respect to the basis for Mr. Jinnette's opinion.

Jinnette admitted that he had never seen the EMS purchased by Sav-Fuel and that he was not familiar with the design of the EMS involved in this case.[14]  Mr. Jinnette acknowledged that some of the equipment could have become obsolete over the years. Therefore, we assign no weight to Mr. Jinnette's conclusion regarding the useful life of the EMS and instead base our analysis on the assumption in the PPM that the EMS had a useful life of 25 years.  This is the useful life projected at the time the limited partnership interests in Sav-Fuel were offered to investors.

### 4.   Anticipated Energy Savings

The PPM assumes that the savings in electrical energy costs to Gould would be 20 percent of its annual energy bill. Respondent does not challenge this assumption, and both parties' experts relied on this assumption for purposes of determining projected income.

### 5.   Inflation Rate of Energy Costs

The PPM assumes that the inflation in energy costs would be 20 percent per year.  Petitioner contends that there were energy supply shortages around 1980, and that it was not unreasonable at

---

[14]We note that the evidence in the record includes a letter from Mr. Jinnette stating that properly maintained industrial equipment of the same type as the EMS has a useful life of 10 years to more than 20 years.  This is seemingly inconsistent with petitioner's assertions and Mr. Jinnette's statements in his report and at trial that the EMS had a useful life of at least 30 years.

that time to project an average annual increase of 20 percent for the foreseeable future and for purposes of calculating profit potentials for energy investments.  Respondent disagrees with the 20-percent rate and contends that the highest rate of inflation in energy costs would have been 18.5 percent.

Respondent relies on the report and testimony of Dr. Mark Rodekohr (Dr. Rodekohr), the director of the Energy Markets and Contingency Information Division at the Energy Information Administration, U.S. Department of Energy.  Dr. Rodekohr received a bachelor of science degree in economics in 1970 from the University of Delaware and a Ph.D. in economics from the University of Colorado in 1974.  Dr. Rodekohr has 30 years' experience in forecasting and analysis of energy issues for the Department of Energy.  His background includes experience in the analysis of energy prices, demand, household energy expenditures, international energy issues, and natural gas supply and demand issues.

In his report, Dr. Rodekohr stated that he had reviewed projections of electricity prices in the commercial and industrial sectors that were available in 1980.  The projections he used were taken from the Energy Information Administration's Annual Energy Outlook 1980, and he represented that these projections have generally been available annually from 1974 to the present.  On the basis of the data contained in the

projections, Dr. Rodekohr stated that it was reasonable to assume a real price increase of 5 percent per year.[15]  To account for inflation, Dr. Rodekohr reviewed the consumer price index and added 13.5 percent to the 5-percent increase rate because he felt that it would have been reasonable to expect that amount of increase in inflation for 1980.[16]

Although respondent has presented persuasive evidence that the annual percentage increase in energy costs would not exceed 18.5 percent, we will apply the 20-percent rate and energy cost amounts assumed in the PPM and advocated by petitioner.  As explained below, even after we apply the higher rate, the net cashflow (disregarding tax considerations) is negative.[17]

---

[15]Dr. Rodekohr noted that this assumption was generous in that for the commercial sector the average annual rate of increase in prices was 1.4 percent per year between 1978 and 1995 and for the industrial sector it was 2.5 percent per year.  He stated that the 5-percent figure he used was the highest average annual change between any two periods included in the projections.

[16]Dr. Rodekohr noted that 13.5 percent was the highest rate experienced during the years 1979 to 1981.  He represented that the inflation rates for the years 1979 and 1981 were 11.3 percent and 10.3 percent, respectively.

[17]The higher the annual rate of increase in energy costs, the higher the savings rate would be and the more cash Sav-Fuel would receive under its arrangement with Gould and CEF.  Conversely, a lower annual rate of increase in energy costs would result in less savings and cashflow each year, yielding a lower overall net present value.

6. <u>Discount Rate</u>

The parties generally disagree as to the appropriate discount rate to apply. Petitioner claims that the appropriate rate is 15 percent while respondent contends that it is 18.96 percent. The parties rely on expert reports and our opinion in <u>Gianaris v. Commissioner</u>, T.C. Memo. 1992-642.

In <u>Gianaris</u>, we stated that the experts in that case had testified and the taxpayers had not challenged that long-term U.S. Government bonds yielded, on average, about 11.5 or 11.6 percent in 1980 and 13 percent in 1982. We felt that a premium, above the benchmark rate of return on U.S. Government debt, was necessary to compensate for the additional risk involved in the partnerships. We stated that profit-seeking investors in similar EMS tax shelters would reasonably have required a rate of return of no less than 15 percent. However, for purposes of making our calculations, we assumed discount rates equal to the rate of return on U.S. Government debt because if the investments did not show profit at those interest rates, then they would not show profit at the higher rates it could be assumed a profit-seeking investor would demand.

Petitioner relies in part on our statements in <u>Gianaris</u> as a basis for his contention that the appropriate discount rate is 15 percent. In further support of his position, petitioner presented the report and testimony of Douglas J. Horvey (Mr.

Horvey), a certified public accountant (C.P.A.). Mr. Horvey has a degree in accounting from Metropolitan State College of Denver and has been a C.P.A. since 1984. Mr. Horvey represents that he is familiar with the cashflow analysis used by respondent and has used that and similar analyses as part of his work over the years.

One of the stated purposes of Mr. Horvey's report was to provide an opinion as to the appropriate discount rate to be applied to a present value analysis of an investment in an entity such as Sav-Fuel. Mr. Horvey felt that a profit-motivated investor participating in any type of speculative investment would seek a risk-adjusted rate of return greater than the 11.5-percent risk-free rate used in Gianaris. In his opinion, a 15-percent adjusted rate of return was reasonable if the required risk adjustment was 125 percent of the risk-free rate of return. However, Mr. Horvey provided separate calculations of net present value using discount rates of 11.5 percent, 12 percent, 13 percent, 14 percent, 15 percent, and 16 percent.

Mr. Horvey's calculation of net present value uses many of the same figures and assumptions as the calculation contained in the attached appendix. However, Mr. Horvey carried the cashflow analysis through June 30, 2030, the anticipated dissolution date of Sav-Fuel. As explained earlier, we have assumed consistent with the PPM that the useful life of the EMS was 25 years. The

evidence in the record reflects that this was the partnership's only asset and source of income. Thus, the proper net present value analysis in this case should be for a term of 25 years. Although Mr. Horvey's calculations are helpful through the year 2005, his ultimate conclusion based on a 50-year cashflow analysis is misplaced.

Respondent's argument that the appropriate discount rate to apply is 18.96 percent is based on the report and testimony of Ken D. Howell (Mr. Howell), a petroleum engineer. Mr. Howell is currently responsible for conducting independent examinations of tax returns filed by large organizations. His duties require knowledge of engineering valuation principles, tax law, and industry practice, and for the last 12 years he has prepared written technical and valuation reports to taxpayers.

Mr. Howell used the buildup method[18] to arrive at a discount rate he felt was appropriate. Mr. Howell stated that the average rate of return on a 20-year U.S. Government bond in 1980 was 11.36 percent (which would be the risk-free rate of return for 1980). Mr. Howell felt that it was appropriate to add an equity risk premium to this figure to arrive at the discount rate. Using historical data published in Stocks, Bonds, Bills, and

[18]According to Mr. Howell, the buildup method is an additive model in which the return on an asset is estimated as the sum of a risk-free rate and appropriate risk premiums, such as equity risk and firm size risk.

Inflation by Ibbotson Associates, Mr. Howell applied an equity risk premium of 7.6 percent for 1980, resulting in a discount rate of 18.96 percent.

After reviewing the expert reports and testimony, as well as our opinion in Gianaris, we feel that it is appropriate to apply an 11.5-percent discount rate despite the fact that a more realistic rate is 15 percent. This is consistent with our approach in Gianaris.

### 7. Analysis

On the basis of the undisputed assumptions in the PPM and our findings above (including application of a discount rate of 11.5 percent),[19] we have calculated the net present values, as of 1980, of Sav-Fuel's up-front payments and net receipts (taking into account further payments to Nisona and all other fees).[20]

---

[19]Again, we note that we have made certain assumptions most favorable to petitioner and that using more realistic assumptions and figures would result in a significantly lower net present value. See, e.g., Gianaris v. Commissioner, T.C. Memo. 1992-642.

[20]In Gianaris v. Commissioner, supra at n.7, we explained the determination of present value as follows:

> To determine the present value of a single future payment, the amount of that payment is divided by the sum $(1 + i)^n$, where i equals the appropriate interest (discount) rate and n equals the number of periods (amount of time) to be taken into account. $PV = CF / (1 + i)^n$. (CF stands for "cash flow".)

We explained the determination of net present value as follows: "At a given interest (discount) rate, $NPV = CF_0 + CF_1 /(1+i)^1 + CF_2 /(1+i)^2 + * * * + CF_n /(i +1)^n$." Id. at n.8.

Because our calculations show that the net present value, as of 1980, of the up-front payments exceeds the net present value of net receipts by $178,656, we have determined Sav-Fuel's net cashflow to be negative $178,656. The details of our conclusion are contained in the attached appendix. Our finding of a projected negative cashflow (disregarding tax considerations) demonstrates that Sav-Fuel could not reasonably have hoped to recoup its investment in the EMS, much less earn an economic profit independent of tax considerations.

II. Addition to Tax Under Section 6659(a)

Under section 6659, a graduated addition to tax is imposed when an individual has an underpayment of tax of at least $1,000 that is attributable to a valuation overstatement. Sec. 6659(a), (d). A valuation overstatement exists if the value of any property, or the adjusted basis of any property, claimed on any return exceeds 150 percent of the amount determined to be the correct valuation or adjusted basis. Sec. 6659(c)(1). If the claimed valuation exceeds 250 percent of the correct value, the addition is equal to 30 percent of the underpayment. Sec. 6659(b).

Petitioner's claimed loss deduction was related to the value of the EMS. As discussed earlier, the PPM states that Sav-Fuel purchased the EMS from Nisona in 1980 for $10,350,000, despite the fact that an earlier sale in 1980 of the EMS between

unrelated parties was for $337,000.  On brief, petitioner relies on evidence not admitted into the record and his own self-serving statements in arguing that the value of the EMS was actually $5 million.  We do not accept petitioner's unsupported claim that the EMS was actually worth $5 million, which we note is still less than half of the $10,350,000 claimed value of the property. The contemporaneous sale of the EMS for $337,000 makes it clear that the claimed valuation of $10,350,000 exceeded 250 percent of the correct value of the EMS.[21]

Under section 6659(e), the Commissioner may waive all or any part of the addition to tax for a valuation overstatement if the taxpayer shows that there was a "reasonable basis for the valuation * * * claimed on the return and that such claim was in good faith."  The Commissioner's waiver is discretionary and subject to review for abuse of discretion.  Krause v. Commissioner, 99 T.C. 132, 179 (1992).  Petitioner has not shown that there was a reasonable basis for the valuation overstatement of the EMS.  Accordingly, we hold that petitioner is liable for the addition to tax of 30 percent of the underpayment of tax under section 6659.

---

[21]We note that in order for petitioner to avoid application of the 30-percent addition under sec. 6659(b), the EMS would have to have had a minimum correct value of $4,140,000 (10,350,000 ÷ 2.50 = 4,140,000).  The evidence in the record reflects that the correct value of the EMS was substantially below this amount.

III. Increased Interest Under Section 6621(d)

As applicable to this case, section 6621(d)(1) provided that "In the case of interest * * * with respect to any substantial underpayment attributable to tax motivated transactions, the annual rate of interest * * * shall be 120 percent of the adjusted rate".[22]  A substantial underpayment attributable to a tax-motivated transaction is defined as "any underpayment of taxes * * * which is attributable to 1 or more tax motivated transactions if the amount of the underpayment for such year so attributable exceeds $1,000."  Sec. 6621(d)(2).  The term "tax-motivated transaction" includes any valuation overstatement within the meaning of section 6659(c).  Sec. 6621(d)(3)(A)(i).  Additionally, tax-motivated transactions include activities not engaged in for profit.  Hildebrand v. Commissioner, 28 F.3d at 1028; sec. 301.6621-2T, Q&A-4, Temporary Proced. & Admin. Regs.,

_____

[22]Sec. 6621(d) was enacted by the Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 144(a), 98 Stat. 682.  Sec. 6621(d) applies with respect to interest accruing after Dec. 31, 1984, regardless of the date the return was filed.  Solowiejczyk v. Commissioner, 85 T.C. 552, 556 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986).  The Tax Reform Act of 1986, Pub. L. 99-514, sec. 1511(c), 100 Stat. 2744, redesignated and amended sec. 6621(d) as sec. 6621(c).  Sec. 6621(c) was repealed by the Omnibus Budget Reconciliation Act of 1989, Pub. L. 101-239, sec. 7721(b), 103 Stat. 2399, effective for returns the due date for which is after Dec. 31, 1989.  Current sec. 6621(c), which was enacted by the Omnibus Budget Reconciliation Act of 1990, Pub. L. 101-508, sec. 11341(a), 104 Stat. 1388-470 (effective for purposes of determining interest for periods after Dec. 31, 1990), applies an additional 2-percent interest rate on deficiencies attributable to large corporate underpayments of tax.

49 Fed. Reg. 59394 (Dec. 28, 1984).  We have jurisdiction to determine the portion (if any) of a deficiency which is a substantial underpayment attributable to a tax-motivated transaction.  Sec. 6621(d)(4); Law v. Commissioner, 84 T.C. 985, 988 (1985).

We have found both that there was a valuation overstatement within the meaning of section 6659(c) and that the EMS-related activity was not engaged in for profit.  Accordingly, we hold that petitioner is liable for increased interest under section 6621(d).  See Krause v. Commissioner, supra at 180; Osowski v. Commissioner, T.C. Memo. 2000-367; Barlow v. Commissioner, T.C. Memo. 2000-339, affd. 301 F.3d 714 (6th Cir. 2002).

Decision will be entered

under Rule 155.

APPENDIX

I.  Discounted Receipts

| Year | Projected Nominal Receipts[1] | 1980 Present Value[2] |
|------|------------------------------|----------------------|
| 1980 | -0- | -0- |
| 1981 | $12,035 | $10,794 |
| 1982 | 16,524 | 13,291 |
| 1983 | 19,829 | 14,305 |
| 1984 | 23,795 | 15,395 |
| 1985 | 28,554 | 16,569 |
| 1986 | 34,264 | 17,832 |
| 1987 | 41,117 | 19,191 |
| 1988 | 49,341 | 20,654 |
| 1989 | 59,209 | 22,229 |
| 1990 | 71,051 | 23,923 |
| 1991 | 85,261 | 25,747 |
| 1992 | 102,313 | 27,710 |
| 1993 | 122,776 | 29,822 |
| 1994 | 147,331 | 32,096 |
| 1995 | 176,797 | 34,542 |
| 1996 | 212,156 | 37,176 |
| 1997 | 254,588 | 40,010 |
| 1998 | 305,505 | 43,060 |
| 1999 | 366,606 | 46,342 |
| 2000 | 439,927 | 49,875 |
| 2001 | 527,913 | 53,677 |
| 2002 | 633,495 | 57,769 |
| 2003 | 760,194 | 62,173 |
| 2004 | 1,328,433 | 97,441 |
| 2005 | 5,473,399 | 360,069 |
| Total receipts | 11,292,413 | 1,171,692 |

[1]This figure takes into account management fees paid to CEF and payments to Nisona on the nonrecourse note.  The amounts and timing of the principal and interest payments to Nisona are based on the projections contained in the PPM.
[2]A discount rate of 11.5 percent is assumed.

II.  <u>Discounted Costs</u>

| Year | Nominal Costs | 1980 Present Value[1] |
|------|---------------|-----------------------|
| 1980 | ($1,092,500) | ($1,092,500) |
| 1981 | (287,500) | (257,848) |
| Total costs | (1,380,000) | (1,350,348) |

[1]A discount rate of 11.5 percent is assumed.

III.  <u>Discounted Net Cashflow</u>

| | |
|---|---|
| Discounted receipts | $1,171,692 |
| Discounted costs | (1,350,348) |
| Discounted net cashflow | (178,656) |