**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 13 2001**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

K. RICHARD KEELER,

      Petitioner - Appellant,

v.

COMMISSIONER OF INTERNAL
REVENUE,

      Respondent - Appellee.

No. 99-9032

Appeal from the United States Tax Court
T.C. No. 8648-93

Matthew D. Lerner, Steptoe & Johnson LLP, Washington, D.C., for the
Petitioner-Appellant.

Donald B. Tobin (Kenneth L. Greene with him on the brief), Department of
Justice, Tax Division, Washington, D.C., for the Respondent-Appellee.

Before **EBEL**, **McKAY** and **LUCERO**, Circuit Judges.

**LUCERO**, Circuit Judge.

      We consider whether the Commissioner of Internal Revenue properly

disallowed losses incurred by petitioner-appellant K. Richard Keeler ("taxpayer")

through his participation in a derivatives market created by Merit Securities, Inc.

The Commissioner determined taxpayer's transactions lacked economic substance and were not entered into primarily for profit. The Tax Court agreed with the Commissioner, holding that taxpayer's gains and losses from trading in the Merit market could not be recognized for tax purposes. The court also ordered Keeler to pay additional taxes for his negligence in reporting losses under I.R.C. § 6653(a) and increased interest for substantial underpayments attributable to tax-motivated transactions under I.R.C. § 6621(c). See Leema Enters., Inc. v. Comm'r, 77 T.C.M. (CCH) 1261 (1999). Exercising jurisdiction pursuant to I.R.C. § 7482, we affirm.

## I

The trading program we examine provided hefty opportunities for tax savings but only illusory opportunities for economic profit. Under scrutiny, what profit potential the Merit markets offered appears anemic beside their considerable capacity for tax gaming. Merit traders incurred inflated losses in one year and recognized corresponding gains in the next, accelerating deductions and deferring gains to reduce overall tax liability in a given year to as little as zero. These "straddle" trades allowed taxpayer to exploit the necessary construct of separate taxable years and to violate a cardinal rule of the tax code: transactions lacking economic substance are not recognized for tax purposes. See Gregory v. Helvering, 293 U.S. 465, 469–70 (1935).

Because the relevant facts in this case are recounted in the Tax Court's exhaustive opinion, we need only summarize them here. In 1981, Congress passed the Economic Recovery Tax Act of 1981 ("ERTA"), Pub. L. No. 97-34, § 501(a), 95 Stat. 172, 323. To limit the use of straddle tax shelters, ERTA added § 1092 to the Internal Revenue Code ("the Code"), providing that losses from straddle trades can be recognized only to the extent they exceed unrealized gain on the offsetting portion of the straddle.[1] See I.R.C. § 1092; S. Rep. No. 97-144, at 9 (1981). However, losses from ownership of stock were excepted from § 1092's loss disallowance rule, and in 1981 Merit created its stock forwards program, the derivatives trading market at issue in the instant case.

Participation in the stock forwards program allowed taxpayer to incur significant tax losses in one year while deferring corresponding gain into future taxable years by holding instruments in the form of a straddle, a hedged position composed of two substantially offsetting positions. Typically, taxpayer would purchase both a long contract to buy stock from Merit at a future date and specified price and an equivalent short contract to sell the same stock to Merit at another future date and specified price. A rise in the value of one contract, or

---

[1] Merit also offered a T-bill options program in which taxpayer participated in 1980 and 1981, as well as a T-bond options program in which taxpayer did not participate. Both of these programs were shut down after the passage of ERTA, and neither is at issue in this case.

"leg," ordinarily approximates a decline in the value of the other leg, functioning as a hedge against adverse market moves. While the price differential between two legs may change, a straddle carries substantially less risk than a single short or long contract—and correspondingly less profit potential. Ownership of "combination spreads" further limited the risk to investors through the acquisition of two straddles on the same underlying security. In order for a combination spread to undergo a net change in value, the price differential between the legs of one straddle would have to change with respect to the price differential of the legs of the other straddle.

Nearly all of the trades in Merit's stock forwards program exhibited an "open-switch-close" pattern. An investor "opened" a position by buying or selling a straddle. Late in the year of purchase, the investor would sell or cancel the losing leg—recognizing a tax loss—and purchase a replacement leg (the "switch"), waiting until the new tax year to close out his or her position and recognize gains approximating taxable losses from the previous December. Although cancellations are typically used in derivatives trading only to correct errors, see Freytag v. Comm'r, 904 F.2d 1011, 1014 n.4 (5th Cir. 1990), aff'd on other issues, 501 U.S. 868 (1991), Merit's promotional materials advertised that positions could be canceled and losses from cancellations could be deducted as ordinary losses.

-4-

Because the forward contracts were not subject to the loss disallowance rules of ERTA, investors could continue to enjoy the tax advantages of the "open-switch-close" sequence no longer available through Merit's option programs. Merit's offering memorandum for the stock forwards program included an extended discussion of its tax advantages.[2] In contrast, detailed projections of actual economic returns were notably absent from the document.

The high volatility of the stocks chosen as the underlying securities in the program ensured that substantial tax losses would be available at year's end. The stock forwards program was open only to sophisticated, experienced investors, and Merit's small group of clients transacted almost exclusively among themselves, never with unrelated participants, making arms-length competitive pricing improbable at best.

Merit profited from operation of its markets in two ways. First, it charged a fee known as a "bid/ask differential," which, with few exceptions, was used only on opening transactions. Second, it retained the interest on participants' margin deposits. Merit's investors maintained margin accounts in amounts much larger than its explicit margin policy would suggest was necessary. For example,

---

[2] The offering memorandum also warned that "[c]hanges in the tax laws . . . may be enacted in the future that could eliminate, reduce or otherwise affect the anticipated benefits of an investment in the Forward Contracts." (Trial R. Ex. 74-BV at 7–8.)

taxpayer had approximately $1.2 million on deposit for over a year, while his margin requirement averaged less than $200,000.

Instruments traded on the stock forwards market were not listed on any formal exchange, registered with the Securities and Exchange Commission or sold anywhere outside the Merit market, and the prices of the contracts were determined according to a Merit-devised formula. Although option and forward contracts contemplate actual delivery of the underlying commodity or security, delivery was the rare exception in the Merit programs: Out of 54,065 transactions, investors took delivery on only two, and taxpayer never took delivery.[3] See Freytag, 904 F.2d at 1013 ("It is the norm that marketplace investors enter into forward contracts intending to take or make delivery of the underlying security on a specified date.").

In 1981, the first year of the stock forwards program, every participant took a first-year loss, for aggregate losses of $75.3 million. Those losses were accompanied by simultaneous replacement contracts and by aggregate unrealized gains of $73.5 million. In 1982, the aggregate loss incurred late in the year was $15.8 million, and the amount of offsetting unrealized gains was $13.9 million.

---

[3] Taxpayer contends there were six delivery transactions, but he fails to indicate where in the voluminous record that evidence may be found.

Taxpayer's results in the stock forwards program mimicked that pattern. In 1981, his net losses of $7,598,940 in the Merit programs were within $3660 of his adjusted gross income ("AGI")—a difference of only 0.05%—offsetting his entire AGI for that year. Of his seventeen transactions in that year, only one produced a gain. All of taxpayer's closing transactions in December of 1981 produced realized losses. In 1982, his December losses offset ninety-seven percent of his adjusted gross income for that year, including gains incurred in January by closing out his 1981 straddles. Of taxpayer's forty-three closing transactions in December 1982, each produced a loss, for a total of $9,955,447.

Amid concern that taxpayers were exploiting a loophole to achieve tax deferral, Congress repealed its exception of stock from the loss disallowance rules of I.R.C. § 1092, effective for positions established after December 31, 1983. See Deficit Reduction Act of 1984 ("DEFRA"), Pub. L. No. 98-369,

§ 101, 98 Stat. 494.[4]  Taxpayer ended his participation in the stock forwards

program in January 1984.

The Commissioner disallowed taxpayer's claimed Merit losses from 1981,

1982, and 1983 and issued a notice of deficiencies and additions to tax.

Following trial, the Tax Court determined Keeler's liability in the following

amounts:

| Year | Deficiency | Additions to Tax: § 6653(a)(1) |
|------|------------|-------------------------------|
| 1981 | $3,261,609 | $163,080 |
| 1982 | 973,459 | 48,673 |
| 1983 | 7,320 | 366 |

The Tax Court also ordered additions to tax pursuant to I.R.C. § 6653(a)(2) in

amounts equal to fifty percent of the statutory interest on his deficiencies, as well

---

[4]  The legislative history of DEFRA leaves no doubt that Congress had in mind the type of straddle transactions in which taxpayer engaged when it passed the legislation:

> Taxpayers have attempted to exploit the exemption from the loss-deferral rule for exchange-traded stock options to defer tax on income from unrelated transactions.  If effective, these straddles in stock options defer gains from one year to the next by creating a recognized loss on an option that is matched by an unrecognized gain on an offsetting option.

S. Rep. No. 98-169, at 288–89 (1984).

as increased interest on underpayments attributable to tax-motivated transactions pursuant to I.R.C. § 6621(c).

## II

In inquiring whether taxpayer's deductions were properly disallowed, we look past the form of the transactions at issue and examine their substance. We conclude the Tax Court properly determined that the Merit trades were intended as generators of tax benefits, not of economic profits. See Leema Enters., slip op. at 45 ("[T]he substance of the Merit transactions did not reflect their form. The form was the investment in financial products; the substance was the production of tax deductions.").

### A. Economic Substance

When examining a finding that a transaction lacks economic substance, this Court reviews findings of fact for clear error and the lower court's ultimate legal determinations de novo. See James v. Comm'r, 899 F.2d 905, 909 (10th Cir. 1990).

The federal income tax laws do not permit deduction of losses incurred in transactions that lack economic substance. See Gregory, 293 U.S. at 469–70; Jackson v. Comm'r, 966 F.2d 598, 600 (10th Cir. 1992). "A transaction will be accorded tax recognition only if it has 'economic substance which is . . . imbued with tax-independent considerations, and is not shaped solely by tax-avoidance

features . . . ." James, 899 F.2d at 908 (quoting Frank Lyon Co. v. United States, 435 U.S. 561, 583–84 (1978)).

We have held that straddle losses are not deductible when they are the result of tax-motivated transactions. See Bohrer v. Comm'r, 945 F.2d 344, 345–46, 348 (10th Cir. 1991) (describing straddle transactions and holding losses arising from them are not deductible when they lack economic substance). In the instant case, which involved straddle transactions similar to those found to be shams in Bohrer, the Tax Court found that "the principal attraction of the Merit markets plainly was the ability to generate tax deductions far in excess of the amounts invested." Leema Enters., slip op. at 45. That ability is the hallmark of tax avoidance schemes and, if present, supports the Commissioner's disallowance of taxpayer's claimed losses.

Several features of the Merit markets support the Tax Court's conclusion that taxpayer's Merit trades lacked economic substance. The origin of the stock forwards market indicates that its raison d'être was tax avoidance. Both in the options programs and later in the stock forwards program, Merit investors traded exclusively in tax-advantaged assets. Participation in the T-bill program ground to a halt shortly after the passage of ERTA, even though the legislation did not impair the economic profitability of options trading. Immediately thereafter, Merit developed a stock forwards market that it explicitly promoted as providing

-10-

tax benefits no longer available through options straddles. While the offering memorandum described at length the program's anticipated tax benefits, it lacked detailed projections of realistic economic returns taking into account transaction fees and foregone interest. That omission suggests the transactions were designed to generate tax benefits, not economic gains. See Bohrer, 945 F.2d at 348. Notably, when DEFRA finally eliminated the tax advantage of straddle transactions, the stock forwards market disappeared, as had the T-bill and T-bond programs in the wake of ERTA.

The operation of the markets themselves reveals a trading scheme designed primarily to capture tax benefits rather than economic gains. Merit restricted its trades to straddles and combination spreads while charging large transaction fees, reducing to almost nil the realistic expectation of economic gain. Merit investors, including taxpayer, deliberately incurred losses in a given tax year—often nearly equivalent to the year's gains—by "switching" after holding initial positions for short periods of time.[5] In contrast, "a typical straddle traded for nontax purposes will not include a switch." Miller v. Comm'r, 836 F.2d 1274, 1276 (10th Cir. 1988). The consistency of the "open-switch-close" pattern

---

[5] In the stock forwards market, all fifty-two investors, including taxpayer, incurred first-year losses. In the T-bond market, all twenty-six investors incurred first-year losses, and in the T-bill market, only one of the seventy-six accounts not owned by Merit made a first-year profit.

in taxpayer's account is persuasive evidence that he was trading for tax deductions more than for economic benefits. See id. at 1277 (noting that trading patterns containing switches may alone be indicative of tax avoidance). Like the majority of Merit investors, taxpayer consistently rolled the offsetting taxable gains into later years. In the aggregate, any actual economic gains from changes in the Merit straddle positions were overshadowed by the tax losses generated in year-end trading. Importantly, the "open-switch-close" sequence also allowed conversion of short-term capital gains to tax-favored long-term capital gains when an investor maintained a hedged position well into a second tax year. See id. at 1276–77.

While it is true that investors routinely make decisions with an eye to decreasing tax liability, the deliberate incurrence of first-year losses may be an indication that a transaction lacks economic substance. See Bohrer, 945 F.2d at 348 (citing Glass v. Comm'r, 87 T.C. 1087, 1176 (1986)). Economically, taxpayer's recognized losses on his Merit trades in 1981 and 1982 were not losses at all because of their offsetting gain legs; they were taxed as losses due only to the necessary but artificial device of separate taxable years. Deduction of several million dollars in losses distorted taxpayer's economic results and violated the principle that tax advantages must be linked to actual losses. See Gregory, 293 U.S. at 469; Bohrer, 945 F.2d at 347. Moreover, correlation of

losses to tax needs coupled with a general indifference to, or absence of, economic profits may reflect a lack of economic substance. See Freytag v. Comm'r, 89 T.C. 849, 877–78 (1987). As we note above, taxpayer's stock forwards losses offset 100% of his AGI in 1981 and 97% in 1982. Alongside the fact that taxpayer continued to trade on the Merit market despite two years of consistent losses, the close correlation of losses to tax needs strongly suggests his transactions lacked "tax-independent considerations." James, 899 F.2d at 908 (internal quotation omitted).

Merit's fee structure also supports the Tax Court's finding that the transactions lacked economic substance. The practice of charging bid/ask fees only on opening transactions rather than on each individual trade suggests that "the first trade was in fact only the first link in a prearranged chain of transactions." Leema Enters., slip op. at 64. That prearranged chain is the "open-switch-close" sequence to which we have referred. On other markets, bid/ask charges typically occur on each trade because the number of transactions can not be anticipated at the outset. Along with its practice of retaining customers' margin deposits in larger amounts and for longer periods than required, Merit's bid/ask method supports the Tax Court's finding that the substance of Merit's operation was "the production of tax deductions." Id. at 45. Finally, even though option contracts are frequently traded without delivery of

-13-

the underlying commodities, the fact that Merit customers took delivery on only two of several thousand contracts indicates Merit was "playing a football game without a football." Id. at 66 (quoting Price v. Comm'r, 88 T.C. 860, 884 (1987)).

The Tax Court also found that the prices of the items traded were not set by market forces, but by Merit. Contrary to taxpayer's assertion, any alleged negotiation between Merit and its customers as to the prices of the legs falls short of demonstrating economic substance, because the importance of the instruments' prices was dwarfed by their tax advantages.

Taxpayer's approach in his lengthy brief is to highlight those individual features of his Merit trades that arguably lend support to his position. Although the record contains isolated examples of transactions that depart from the trading pattern we have described, they can not overcome the presumption of lack of economic substance that emerges from a common-sense examination of the evidence as a whole. Taxpayer's description of ways in which investors could theoretically profit on the Merit markets and his citation of individual profitable Merit trades are insufficient to "impute substance into an otherwise sham transaction," Krumhorn v. Comm'r, 103 T.C. 29, 55 (1994) (citation omitted), because the existence of some potential for profit does not foreclose a finding of no economic substance, see Bohrer, 945 F.2d at 348.

Taxpayer's reliance on Laureys v. Comm'r, 92 T.C. 101 (1989), in which the Tax Court permitted deduction of straddle losses, is unavailing. In that case, the Tax Court was persuaded that the taxpayers were motivated by profit potential, and the Commissioner did "not contend that the transactions . . . [were] sham[s]." Id. at 121.

The Tax Court's findings of fact were plausible, and viewed together those findings support the Tax Court's determination that the Merit trades lacked economic substance. See James, 899 F.2d at 908. Because taxpayer's transactions did not have any "practical economic effects other than the creation of income tax losses," the Commissioner properly disallowed losses resulting from those transactions. Id. at 908–09 (quoting Sochin v. Comm'r, 843 F.3d 351, 354 (9th Cir. 1988)).

**B. Profit Motive**

The Tax Court's determination that a taxpayer lacked an actual profit objective is a finding of fact reviewable for clear error. Hildebrand v. Comm'r, 28 F.3d 1024, 1026 (10th Cir. 1994).

Section 165(c) of the Code permits deduction only of those losses that are incurred in a trade or business or result from transactions entered into primarily for profit. I.R.C. § 165(c)(1) & (2); see also id. § 183(a) (disallowing deductions attributable to activities not engaged in for profit). This Court has disallowed tax

straddle losses that were not "'incurred in any transaction entered into for profit' as required by I.R.C. § 165(c)(2)." Miller, 836 F.2d at 1278 (quoting Smith v. Comm'r, 78 T.C. 350, 390–91 (1982) (citation omitted)); see also Bohrer, 945 F.2d at 348.

Taxpayer argues that his Merit transactions were part of his "trade or business" because he has earned a living as a trader, has spent at least forty hours per week trading, and has invested in other derivatives markets. We decline taxpayer's invitation to hold that his losses from the Merit trades are deductible under § 165(c)(1) as resulting from "trade or business."[6] While it may be true that on the whole, taxpayer invests to earn profits, the Tax Court plausibly viewed this particular venture—derivatives trading on a market with characteristics of an economic sham—as outside the purview of any general profit motive in taxpayer's trading. Even if we were convinced that the Merit trades were part of taxpayer's overall profit-motivated investment strategy, the transactions themselves would have to be profit-motivated in order to be deductible under § 165(c). As the Tax Court noted, the general test for whether an individual is engaged in a "trade or business" under the Code is whether the

_____

[6] In its stock forwards offering memorandum, Merit emphasized that its discussion of income tax consequences "assumes that an Investor is not . . . engaged in the trade or business of buying and selling securities or forward contracts." (Trial R. Ex. 74-BV at 64.)

primary purpose of the activity is to make a profit. See Zell v. Comm'r, 763 F.2d 1139, 1142 (10th Cir. 1985). "Thus, whether a taxpayer is in a trade or business or not, he or she must have incurred tax straddle losses in an activity engaged in primarily for profit." Leema Enters., slip op. at 67. None of the Tax Court cases cited by taxpayer compels a different conclusion. See, e.g., Laureys, 92 T.C. at 133; Stoller v. Comm'r, 60 T.C.M. (CCH) 1554 (1990), aff'd in part and rev'd in part on other grounds, 994 F.2d 855 (D.C. Cir. 1993), amended, 3 F.3d 1576 (D.C. Cir. 1993). In those cases, the Tax Court found the trading at issue occurred on established markets and was part of taxpayers' overall profit-motivated strategy to hedge their investments.

While straddle programs have the potential to generate profit, the Tax Court properly rejected taxpayer's argument that the Merit trades were profit-motivated. Taxpayer points to periods during which his accounts increased in value and to the fact that more than twenty-five percent of his combination spreads were profitable, but like the Tax Court "[w]e are more impressed with the converse; that is, that some 75 percent of his spreads lost money." Leema Enters., slip op. at 57–58. Moreover, the fact that taxpayer's losses offset almost all of his income—100% and 97%, respectively, in 1981 and 1982—indicates his primary motivation was tax avoidance and not profit potential. Further, as noted above, the deliberate incurrence of losses at the end of each year appears to have

-17-

had little business purpose but great potential for tax deferral.  See Miller, 836 F.2d at 1277 (noting that trading patterns alone may be indicative of tax avoidance).

Even though Merit kept the interest on margin accounts, taxpayer left $1.2 million in his account for over a year, more than $1 million above what Merit required.  Taxpayer, an experienced investor, forfeited the opportunity to earn interest on that amount while paying bid/ask fees that totaled $463,307, making net profit on his Merit activities all but impossible.  His willingness to do so seriously undermines his claim that he participated in the Merit markets primarily for profit.  Along the same lines, the Tax Court found suspect taxpayer's continued trading in the stock forwards program after he and almost every other non-insider investor incurred sizeable losses.  Taxpayer continued trading with Merit even though it was clear that prices and participation on the market were fixed, exiting the program only when Congress eliminated its tax benefits in 1984.

Taxpayer supplies evidence to support his characterization of his trades as motivated by profit potential, but the isolated examples he cites are at odds with the picture of the Merit trades that emerges from the record as a whole.  Because the evidence supports the Tax Court's finding that taxpayer's transactions were not primarily profit-motivated, we may affirm on this ground independently of

our holding as to economic substance. Based on the record viewed in its entirety, we discern no clear error in the Tax Court's account of taxpayer's intent. See Hildebrand, 28 F.3d at 1026.

### C. Additions to Tax for Taxpayer Negligence

We review the Tax Court's factual findings regarding a taxpayer's negligence for clear error and its legal conclusions de novo. See Anderson v. Comm'r, 62 F.3d 1266, 1270 (10th Cir. 1995). "The Commissioner's determination of negligence is presumed correct, and the taxpayer has the burden of proving it wrong." Id. at 1271 (citations omitted).

During the time period relevant to this appeal, § 6653(a)(1) of the Code imposed an addition equal to five percent of an underpayment of income tax where any part of the underpayment was due to negligence or intentional disregard of rules or regulations. "For purposes of section 6653, 'negligence' is lack of due care or failure to do what a reasonable and prudent person would do under similar circumstances." Id. (citation omitted) (construing the prior version of § 6653 relevant to the instant case). When appropriate, a taxpayer is required to make reasonable inquiry into the legality of a tax plan.

Taxpayer has not met his burden of proving he did not act negligently. By all accounts a sophisticated investor, taxpayer nonetheless traded with an inexperienced company knowing prices were set by a formula rather than by

market forces. By keeping substantial overage in his margin account, he lost at least a year's interest on more than $1,000,000. Finally, despite his contention that he thoroughly investigated the Merit markets, taxpayer has failed to produce evidence that he believed the Merit program was anything other than a tax shelter. Taxpayer's alleged reliance on his accountant's advice is insufficient to disprove negligence. His accountant did not testify at trial and represented Merit as well as taxpayer, which prevented the accountant from being able to provide an independent judgment of the Merit program. The Tax Court's finding that taxpayer was negligent was not clearly erroneous, and based on that finding the penalty imposed under I.R.C. § 6653(a)(1) was proper.

Finally, in light of our holding that the transactions at issue lacked economic substance and were not engaged in for profit, the Commissioner properly subjected taxpayer to an increased interest rate under former I.R.C. § 6621(c) (repealed 1989) on the ground that his underpayments were attributable to tax-motivated transactions. See Thompson v. United States, 223 F.3d 1206, 1212 (10th Cir. 2000) (holding that sham transactions are subject to the former I.R.C. § 6621(c) increased penalty provision); Hildebrand, 28 F.3d at 1028 (holding that former § 6621(c) applies to activities not engaged in for profit).

### III

The decision of the Tax Court is **AFFIRMED**.