T.C. Memo. 2012-70

UNITED STATES TAX COURT

NEAL D. CRISPIN, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 28980-07.                    Filed March 14, 2012.

<u>George W. Connelly, Jr.,</u> and <u>Paul H. Masters</u>, for petitioner.

<u>M. Kathryn Bellis</u> and <u>Adam P. Sweet</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

KROUPA, <u>Judge</u>: Respondent determined a $3,052,005[1] deficiency in, and a

$1,220,802 accuracy-related penalty, with respect to petitioner's Federal income

_____

[1]All monetary amounts are rounded to the nearest dollar.

tax for 2001. The question before us is whether petitioner is entitled to an ordinary loss deduction from his participation in a Custom Adjustable Rate Debt Structure (CARDS) transaction. We hold he is not because the transaction lacks economic substance. We also must decide whether petitioner is liable for an accuracy-related penalty under section 6662.[2] We hold he is liable for the penalty.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. We incorporate the Stipulations of Facts, the Supplemental Stipulation of Facts and the accompanying exhibits by this reference. Petitioner resided in the U.S. Virgin Islands when he filed the petition.

## I. Background

Petitioner earned a Bachelor's Degree in Economics from the University of California at Santa Barbara and a Master's Degree in Business Administration, with a specialty in Finance, from the University of California at Berkeley. After finishing his graduate education, petitioner became a certified public accountant (CPA) and was hired by the accounting firm Arthur Young & Company (Arthur Young). He worked at Arthur Young for seven years and rose to manager,

---

[2]All section references are to the Internal Revenue Code (Code) for 2001, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

spending one year in the tax department. He then accepted a position as Chief Financial Officer of Highlands Energy, an oil and gas company, before leaving two years later to pursue opportunities in the structured financing and leasing industry. Petitioner worked in various areas within the industry but eventually focused on aircraft leasing transactions. Petitioner successfully managed several aircraft leasing investment funds during the 1980s and early 1990s and founded AeroCentury Corp. (AeroCentury) to acquire leased aircraft assets using leveraged financing in the mid 1990s. AeroCentury has grown into a multinational public company with petitioner serving as its Chairman and CEO since its founding.

Petitioner incorporated Murus Equities, Inc. (Murus) in 2001, a subchapter S corporation he wholly owned, to engage in business related to a certain pool of collateralized mortgage obligations (CMO business). Murus received $7,662,600 of shared fees income (shared fees income) from the CMO business for 2001. The shared fees income flowed through to petitioner as required under subchapter S, creating potentially a substantial tax liability.

## II. Entering Into CARDS

Chenery Associates, Inc. (Chenery) promoted a transaction known as CARDS. Chenery marketed CARDS as a tax-driven investment that could be structured to generate ordinary or capital losses for investors. Chenery generally

charged a fee for arranging a CARDS transaction that was based upon the amount of tax benefits generated by the transaction.

Roy E. Hahn, Chenery's founder and a longtime friend of petitioner, presented a CARDS transaction proposal to petitioner in 2001. Mr. Hahn explained the mechanics of a CARDS transaction to petitioner and provided promotional materials describing the tax benefits associated with CARDS for petitioner's consideration. Based upon the presentation and the promotional materials, petitioner knew or had reason to know that a Chenery CARDS transaction could be structured to generate an ordinary loss approximately equal to Murus' shared fees income for 2001.

Petitioner decided to enter into a CARDS transaction in late 2001.[3] Petitioner indicated to Chenery that he wanted it to arrange the CARDS transaction to generate an ordinary loss equal to Murus' shared fees income for 2001. Chenery did not charge petitioner a fee to participate in the CARDS transaction as an accommodation for petitioner's longtime friendship with Mr. Hahn.

---

[3]Petitioner split the CARDS transaction with John F. Campbell. Mr. Campbell was a business associate of petitioner's who also had flow-through income from the CMO business for 2001.

We now turn to the CARDS transaction at issue. We will introduce the entities used to setup the transaction before describing the arrangement.

## III. CARDS Transaction at Issue

### A. Initial Setup

Chenery was responsible for structuring and negotiating petitioner's CARDS transaction. Chenery arranged for Zurich Bank (Zurich) to serve as the lender in the transaction with ZCM Matched Funding Corp. (ZCM) acting as Zurich's agent.[4] Chenery paid Zurich an origination fee for participating in the transaction.

Chenery had Croxley Financial Trading LLC (Croxley), a Delaware limited liability company, organized for the sole purpose of serving as the initial borrower in the transaction. Chenery arranged for Dextra Bank and Trust Co Ltd. (Dextra), a private bank organized under the laws of the Cayman Islands, to be Croxley's sole member. Dextra made a $1,345,000 capital contribution to Croxley. Chenery paid Croxley fees for participating in the CARDS transaction.

---

[4]We refer to Zurich Bank and ZCM Matched Funding Corp. as Zurich for simplicity.

Having introduced the participants, we examine the operation of petitioner's CARDS transaction. We explain the different transactions and the steps that make up the whole.

B.  Loan Origination Phase

Croxley entered into a credit agreement with Zurich whereby Zurich purportedly agreed to lend Croxley 74 million Swiss francs (CHF), with a 30-year maturity (loan) on November 28, 2001. Interest accrued on the loan annually except for the first year of the loan, which had a 1-month interest period and then an 11-month interest period.[5] The interest rate on the loan was the rate for deposits in Swiss francs for a period comparable in length to the corresponding interest period (CHF LIBOR) with a reserve adjustment, plus a spread. The interest rate was determined two business days before the beginning of each interest period. Zurich determined the spread, which reset on the last day of each interest period (spread reset date). The spread for the first two interest periods was originally 50 basis points. Petitioner paid, however, a $29,244 structuring fee to reduce the spread for the first two interest periods to 30 basis points.

---

[5]The first interest period began on December 4, 2001.

Zurich could require Croxley to prepay the full amount of the loan at each spread reset date. This effectively made the loan a 1-year revolving credit facility, with a cancellation option in favor of Zurich.

As a condition precedent to funding, Croxley was required to collateralize the full loan amount with Zurich promissory notes. The requirement that Croxley keep the loan collateralized for its tenure effectively eliminated Zurich's consolidated credit exposure. Zurich was to have complete dominion and control over collateral pledged to secure obligations under the loan (loan collateral) and was to use the loan collateral to satisfy the loan obligations; i.e., interest and principal. If the loan obligations exceeded the collateral value, Croxley had to either prepay a portion of the loan equal to the excess or pledge additional collateral having a value sufficient to eliminate the excess. Zurich could require Croxley to repay the loan if Croxley failed to remedy insufficient collateral.

Croxley requested that Zurich fund the full loan amount and collateralize it with the loan proceeds on December 4, 2001. Zurich funded the loan that same day and deposited the proceeds into Zurich collateral accounts established in Croxley's name. The loan proceeds were used to purchase Zurich promissory notes earning interest at CHF LIBOR and maturing at the end of the first year of

the loan. Croxley immediately pledged the promissory notes as collateral for the loan (initial loan collateral).

C. Assumption Phase

Croxley transferred CHF 4,784,680 of the loan collateral (loan assumption proceeds) to petitioner. In exchange, petitioner purportedly assumed on a joint and several basis one-third of the loan obligations on December 28, 2001. Petitioner immediately pledged the loan assumption proceeds to Zurich as collateral for the assumed loan obligations. He also transferred $43,829 to Zurich as additional collateral. The additional collateral was converted to CHF 74,011 and placed on term deposit with Zurich.

Petitioner and Croxley agreed petitioner would be responsible for all obligations (including maintaining required loan collateral) with respect to the assumed portion of the loan to the extent not covered by the loan collateral, except interest. Croxley was to make interest payments due on the loan from the loan collateral.[6] Because the initial loan collateral earned interest only at CHF LIBOR, such interest payments would cause the loan obligations to exceed the loan collateral by the spread each interest period. Consequently, petitioner was

_____

[6]Croxley applied the loan collateral to payment of interest first and to payment of principal only after all other obligations with respect to the loan had been satisfied.

required to contribute additional collateral each interest period equal in value to the spread amount accruing on the loan for the corresponding interest period. Because these contributions would be used to repay the loan, petitioner effectively bore the cost of the spread even though Croxley made the interest payments.

Petitioner contributed the loan assumption proceeds to Murus. In exchange for the capital contribution, Murus guaranteed petitioner's assumed loan obligations. Murus immediately pledged the loan assumption proceeds to Zurich as collateral for its guaranty.

As part of the prearranged steps of the CARDS transaction, Murus used CHF 1,679,413 of the loan assumption proceeds to purchase a Zurich term deposit earning interest at CHF LIBOR and maturing at the end of the first year of the loan. Murus used CHF 3,105,267, the remaining loan assumption proceeds, to enter into a cross-currency interest rate swap transaction (swap transaction) with Zurich on December 28, 2001.[7]

---

[7]A currency swap transaction is a contract involving different currencies between two or more parties to exchange periodic interim payments on or before maturity of the contract and exchange the swap principal amount upon maturity of the contract. Sec. 1.988-2(e)(2)(ii), Income Tax Regs. The exchange of periodic interim payments is the exchange of payment in one currency for a payment in another currency, with both payments being determined by reference to an interest index applied to the swap principal amount. Sec. 1.988-2(e)(ii)(C), Income Tax Regs.

In accordance with the swap transaction, Murus transferred CHF 3,105,267 to Zurich in exchange for $1,839,007 on December 28, 2001. Murus used the $1,839,007 it received from Zurich on that same day to purchase a Zurich promissory note having a principal amount of $1,839,007 and maturing at the end of the first year of the loan. Zurich held the promissory note as collateral for Murus' guaranty.

The parties were required to make interest payments to each other on the notional amounts of the swap on certain payment dates. The interest earned on the promissory note corresponded to the interest that Murus was obligated to pay Zurich under the swap transaction. Zurich was obligated to pay Murus interest on the CHF 3,105,267 at CHF LIBOR under the swap transaction. Accordingly, for Murus the swap transaction (per its terms) had the economic effect of investing the $1,839,007 it received in the transaction at CHF LIBOR.

The parties closed out the swap transaction less than a year after it began by exchanging the same amounts they had initially swapped.

D. Operational Phase

Collateral could be substituted in petitioner's CARDS transaction with Zurich's prior written consent. Zurich had sole discretion, however, to withhold its consent and to determine the type and amount of acceptable collateral.

Zurich's credit committee was responsible for considering collateral substitution offers. The committee required a credit application, business plan and cashflow projections to consider an offer. Zurich would discount collateral depending on its quality, liquidity and susceptibility to frequent valuation, requiring the borrower to contribute additional collateral to offset the discount applied.

Petitioner discussed with Mr. Hahn the possibility of substituting aircraft as collateral for the loan before entering into the CARDS transaction. Mr. Hahn told petitioner that banks usually prefer financial assets as substitute collateral. Mr. Hahn also told petitioner that an investor in another CARDS transaction had attempted and was unable to substitute aircraft as collateral.

Petitioner never inquired with Zurich about the feasibility of substituting aircraft as collateral, nor did Zurich ever provide petitioner any assurance that such a substitution was feasible. Moreover, petitioner failed to make an offer or prepare any of the documentation necessary to make an offer to substitute aircraft as collateral during the transaction.

E.  Unwinding the CARDS Transaction

On August 15, 2002, Zurich notified petitioner it was terminating the loan at the end of the loan's first year, requiring petitioner to repay the loan by that same date. The collateral securing Murus' guaranty (CHF 4,873,806) was transferred to

petitioner and then to Croxley for unwinding the CARDS transaction. Croxley

repaid the loan with the loan collateral and the CARDS transaction was terminated

on December 4, 2002.

Murus and petitioner had $5,623 and CHF 75,389, respectively, remaining in

their Zurich accounts after unwinding the CARDS transaction. The $5,623

stemmed from interest earned on the swap transaction.[8] The CHF 75,389 consisted

of the CHF 74,011 petitioner contributed as additional collateral, plus interest of

CHF 1,378 from the Zurich term deposit purchased with the additional collateral.[9]

Petitioner earned approximately $6,618 of interest on the CARDS transaction.

IV. Tax Returns for 2001

Murus filed Form 1120S, U.S. Income Tax Return for an S Corporation,

claiming a $7,641,706 ordinary loss for 2001. Murus describes the loss on Form

4797, Sales of Business Property, as a "Swiss Franc Deposit" acquired on

---

[8]The swap transaction obligated Murus to pay Zurich a fixed payment of $32,179 in early 2002. Zurich, however, for some reason not reflected in the record, accepted $26,556 in satisfaction of Murus' obligation.

[9]The terms of the CARDS transaction contemplated that this amount would be used to satisfy the 30 basis point spread on the assumed portion of the loan. For some reason not reflected by the record, the additional collateral was not used to repay the loan.

December 28, 2001 for a cost basis of $9,480,713[10] and sold on the same day for $1,839,007. The loss purportedly resulted from Murus exchanging the CHF 3,105,267 for $1,839,007 in the swap transaction. Murus treated the loss as ordinary under section 988. The ordinary loss substantially offset Murus' shared fees income for 2001. Edwin Nakumura, CPA, prepared Murus' tax returns for 2001.

Petitioner filed Form 1040, U.S. Individual Income Tax Return, for 2001 reporting $3,244 of flowthrough income from Murus, after accounting for the $7.6 million ordinary loss. Doug Takeuchi, CPA, prepared petitioner's tax return.

V. Tax Opinion

In early 2002 petitioner asked Chenery to recommend an attorney to prepare an opinion on the Federal tax consequences of the CARDS transaction. Chenery recommended D. Robert Morris. Mr. Morris is a partner at Pullman & Comley, LLC (Pullman & Comley), holds an LLM in Taxation from New York University School of Law and has broad experience in Federal tax matters.

Petitioner engaged Pullman & Comley to review and issue a tax opinion on the CARDS transaction. Chenery provided petitioner's transactional documents to

[10]Murus claimed a cost basis equal to the loan amount assumed by petitioner (in USD) that is proportional to the fraction of the loan assumption proceeds converted to USD in the swap transaction.

Pullman & Comley for use in preparing the tax opinion. Petitioner provided Mr. Morris his business purpose for entering into the CARDS transaction over the phone.

Before issuing the tax opinion Pullman & Comley asked petitioner to represent certain information about the CARDS transaction. Petitioner represented to Pullman & Comley that (1) he had a business purpose for entering into the CARDS transaction and that (2) he anticipated the CARDS transaction would be profitable, absent tax benefits.

Petitioner received the finalized tax opinion on April 29, 2002, after the 2001 tax returns, both for himself and Murus had been filed. The tax opinion was dated April 10, 2002. Pullman & Comley opined that it is more likely than not that the ordinary loss created by the CARDS transaction would be allowed as a deduction. Pullman & Comley charged petitioner $50,000 for the tax opinion.

VI. Net Result

The net cost of the CARDS transaction to petitioner was $72,926.[11] For that cost, the CARDS transaction yielded an ordinary loss of $7,641,706, reducing petitioner's tax liability for 2001 by approximately $3 million.

_____

[11]The "net cost" equals the $29,544 structuring fee plus the $50,000 Pullman & Comley tax opinion fee paid by petitioner, less the $6,618 of interest petitioner earned in the CARDS transaction.

VII. <u>Deficiency</u>

As previously mentioned, respondent determined a deficiency in, and an accuracy-related penalty with respect to, petitioner's Federal income tax for 2001. Petitioner timely filed a petition with this Court for redetermination.

OPINION

We are asked to decide whether petitioner is entitled to an ordinary loss deduction from the CARDS transaction. Petitioner argues that the loss from the CARDS transaction was claimed in accordance with the letter of the tax laws. He further posits that the transaction has economic substance because he entered into it for a business purpose and had a reasonable possibility of profiting from the transaction. Respondent argues petitioner is not entitled to deduct the loss from the CARDS transaction because petitioner incorrectly reported the Federal income tax treatment of certain steps. Respondent further argues that the claimed loss is disallowed because the CARDS transaction lacks economic substance.[12]

We agree with respondent that the CARDS transaction lacked economic substance. A taxpayer may not deduct losses resulting from a transaction that

_____

[12]Respondent also argues that petitioner's claimed loss is disallowed under sec. 165 because it was not incurred in a transaction entered into for profit and that it is limited by the at-risk rules in sec. 465. We need not reach these arguments because of our other holdings.

lacks economic substance, even if that transaction complies with the literal terms of the Code. See ACM P'ship v. Commissioner, 157 F.3d 231, 246 (3d Cir. 1998), aff'g in part, rev'g in part T.C. Memo. 1997-115; Lerman v. Commissioner, 939 F.2d 44, 45 (3d Cir. 1991), aff'g Fox v. Commissioner, T.C. Memo. 1988-570. Accordingly, we do not address the parties' arguments regarding the merits of petitioner's treatment of each step within the CARDS transaction. Instead, we begin our analysis with the general principles of the economic substance doctrine.[13]

I. Merits of CARDS Under the Economic Substance Doctrine

A court may disregard a transaction for Federal income tax purposes under the economic substance doctrine if it finds that the taxpayer failed to enter into the transaction for a valid business purpose but rather sought to claim tax benefits not contemplated by a reasonable application of the language and purpose of the Code or its regulations.[14] See, e.g., New Phoenix Sunrise Corp. & Subs. v.

---

[13]The taxpayer generally bears the burden of proving the Commissioner's determinations are erroneous. Rule 142(a). The burden of proof may shift to the Commissioner if the taxpayer satisfies certain conditions. Sec. 7491(a). Our resolution is based on a preponderance of the evidence, not on an allocation of the burden of proof. Therefore, we need not consider whether sec. 7491(a) would apply. See Estate of Bongard v. Commissioner, 124 T.C. 95, 111 (2005).

[14]Congress codified the economic substance doctrine mostly as articulated

(continued...)

Commissioner, 132 T.C. 161, 175 (2009), aff'd, 408 Fed. Appx. 908 (6th Cir.

2010); Palm Canyon X Invs., LLC v. Commissioner, T.C. Memo. 2009-288.

Whether a transaction has economic substance is a factual determination. See ACM

P'ship v. Commissioner, 157 F.3d at 245.

We have consistently held that CARDS transactions lack economic

substance. See Kerman v. Commissioner, T.C. Memo. 2011-54; Country Pine Fin.,

LLC v. Commissioner, T.C. Memo. 2009-251. Like the CARDS transactions in

Country Pine Fin., LLC and Kerman, the CARDS transaction here was promoted by

Chenery. As in Country Pine Fin., LLC, Zurich acted as the lender for petitioner's

CARDS transaction. Moreover, the CARDS transactions in both Country Pine Fin.,

LLC and Kerman involved essentially the same steps as petitioner's CARDS

transaction.

Country Pine Fin., LLC and Kerman were appealable to different Courts of

Appeals from the one to which this case is appealable. We are mindful that there

---

[14](...continued)
by the Court of Appeals for the Third Circuit in ACM Pship. v. Commissioner, 157 F.3d 231, 247-248 (3d Cir.1998), aff'g in part and rev'g in part on an issue not relevant here T.C. Memo. 1997–115. See sec. 7701(o), as added to the Code by the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, sec. 1409, 124 Stat. at 1067; see also H. R. Rept. No. 111-443(I), at 291-299 (2010), 2010 U.S.C.C.A.N. 123, 221-231. The codified doctrine does not apply here pursuant to its effective date.

is a split among the Courts of Appeals as to the proper application of the economic substance doctrine. An appeal in this case lies in the Third Circuit absent stipulation to the contrary. Accordingly, we follow the law of that circuit. See Golsen v. Commissioner, 54 T.C. 742 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971).

The Court of Appeals for the Third Circuit in determining whether a transaction has economic substance considers both the taxpayer's subjective business motivation and the objective economic substance of the transaction. See ACM P'ship v. Commissioner, 157 F.3d at 247. These distinct aspects of the economic substance inquiry do not constitute discrete prongs of a rigid two-step analysis but instead are related factors that inform the ultimate analysis of whether the transaction has sufficient substance, independent of tax consequences, to be respected for Federal tax purposes. Id.

The Court of Appeals for the Third Circuit's subjective inquiry focuses on whether the taxpayer (1) intended the transaction to serve a useful business purpose and (2) reasonably expected the transaction to generate a pretax economic profit. ACM P'ship v. Commissioner, 157 F.3d at 252-254; Lerman v. Commissioner, 939 F.2d at 49. The Court of Appeals' objective inquiry focuses on whether, absent tax benefits, the transaction appreciably affected the taxpayer's beneficial economic

interest.  See ACM P'ship v. Commissioner, 157 F.3d at 248; see also CM Holdings, Inc. v. Commissioner, 301 F.3d 96, 103-104 (3d Cir. 2002).  Applying those standards, we hold that petitioner's CARDS transaction lacks economic substance.  We now turn to our underlying reasoning and conclusions for our holding.

A.  Petitioner Lacked a Valid Business Purpose.

Petitioner claims his primary purpose for entering into the CARDS transaction was to secure financing for Murus to start a new aircraft leasing venture from which he anticipated earning a profit.  More specifically, he claims he intended to use the loan assumption proceeds to purchase three Twin-Otter aircraft (with leases attached) and substitute the acquired aircraft as collateral for the loan in December 2002.  The record, however, does not support petitioner's stated business purpose.

First, there are no indicia of petitioner's claimed business purpose other than his own self-serving testimony, which this Court is not required to accept.  See Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).  None of the transactional documents executed in connection with petitioner's CARDS transaction reference aircraft as the intended asset to be financed or purchased.  Similarly, the Pullman & Comley tax opinion does not identify financing aircraft as the purpose of

petitioner's CARDS transaction. Additionally, petitioner never prepared a written business plan or written financial analysis to start a new aircraft leasing venture through Murus or in connection with the CARDS transaction. The absence of indicia of petitioner's claimed business purpose casts doubt on its legitimacy.

Second, petitioner acted inconsistently with his stated business purpose. Petitioner entered into the CARDS transaction without regard for whether Zurich would accept aircraft as substitute collateral. In fact, Mr. Hahn told petitioner that banks prefer financial assets as substitute collateral and that another investor in a CARDS transaction was unable to substitute aircraft as collateral. Moreover, petitioner knew he could not substitute aircraft as collateral for the loan assumption proceeds unless Zurich's credit committee gave its prior written consent. Nevertheless, petitioner, an astute businessman, never sought written assurances from Zurich's credit committee that it would accept aircraft as substitute collateral or even inquired with the committee about the feasibility of such action.[15]

---

[15]Petitioner claims Bill Boyle, a relationship manager with Zurich, told him before he entered into the CARDS transaction that Zurich would "consider" aircraft as collateral. Petitioner contends that based upon Mr. Boyle's alleged statement he was assured by Zurich that he could substitute aircraft as collateral. Other than petitioner's own testimony, the record does not reflect that Mr. Boyle ever made the alleged statement. We do not find petitioner's self-serving testimony credible and

(continued...)

Finally, petitioner failed to take steps necessary to substitute aircraft as collateral during the CARDS transaction. Petitioner could have made an offer to substitute aircraft as collateral at any time during the CARDS transaction but never made one. Petitioner knew that Zurich's credit committee required a credit application, business plan and cashflow projections to consider an offer. Yet petitioner never prepared any of these documents in anticipation of making an offer. Petitioner's decision to go forward with and carry out the CARDS transaction without receiving any assurance that he could substitute aircraft as collateral belies petitioner's claimed business purpose.

Petitioner testified that Mr. Boyle, a relationship manager with Zurich, told him he should begin the process for substituting collateral in June 2002. Petitioner essentially argues on brief that this is why he failed to take steps necessary to begin the process for substituting collateral. We do not find petitioner's self-serving and uncorroborated testimony credible. Moreover, even assuming petitioner's testimony was credible, petitioner still failed to take steps necessary to begin the process for

---

[15](...continued)
are not required to give it any weight. See Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). Even assuming petitioner's testimony is true, petitioner knew that Mr. Boyle had no authority to approve the substitution of aircraft as collateral and therefore could not have reasonably relied on such an assurance from Mr. Boyle.

substituting collateral until August 15, 2002, the date Zurich provided notice that it was terminating the transaction.

We find that petitioner did not have a valid business purpose or anticipate earning a profit when he entered into the CARDS transaction.

B. Tax Avoidance Was Petitioner's Primary Motivation.

Chenery marketed CARDS as a tax-driven investment that would generate ordinary or capital losses for investors. Petitioner did not prepare or rely on a written business plan, profitability analysis or any economic analysis in deciding to enter into the CARDS transaction. Instead petitioner focused on the tax aspects of the transaction. Indeed, the CARDS transaction was intended and prearranged to generate an ordinary loss that would substantially offset Murus' shared fees income for 2001. Petitioner knew the CARDS transaction could generate a loss equal to Murus' 2001 shared fees income and indicated to Chenery that he wanted such a loss. Based upon this, Chenery carefully designed and crafted the prearranged steps of the CARDS transaction to artificially inflate basis and generate petitioner's desired loss. Petitioner's primary focus on the tax aspects of the transaction while ignoring the nontax aspects (i.e., economic profit) indicates that petitioner primarily entered into the transaction to avoid tax.

C.  The CARDS Transaction's Main Nontax Benefit Was Illusory.

Petitioner's CARDS transaction purportedly provided a 30-year credit facility; i.e., access to capital.  Zurich required that the loan assumption proceeds be used as collateral for the loan until termination of the CARDS transaction, when they were used to repay the loan.  Zurich had complete possession, dominion and control over the loan assumption proceeds at all times.  Moreover, petitioner had no right to withdraw the loan assumption proceeds, and Zurich had sole discretion to reject any offer petitioner made to substitute collateral.  Accordingly, the loan assumption proceeds were never meaningfully available for petitioner or Murus to use.

D.  The CARDS Transaction Lacked Profit Potential.

The CARDS transaction's prearranged steps negated any reasonable possibility of economic profit.  A portion of the loan assumption proceeds was used to purchase a Zurich term deposit that earned interest at a rate less than the stated interest rate on the loan.  Similarly, the remaining loan assumption proceeds were committed to a swap transaction that under its terms had the economic effect of investing those proceeds too at an interest rate that was less than the stated interest rate on the loan.  Accordingly, petitioner's CARDS transaction contemplated using the loan assumption proceeds to make investments that had no chance of earning a

return that would exceed petitioner's borrowing cost, guaranteeing petitioner a loss. Moreover, petitioner had no right to invest the loan assumption proceeds in riskier assets that could earn a higher return because Zurich had sole discretion over how the collateral could be invested.

Petitioner argues that he intended to use the CARDS transaction to finance a new aircraft leasing venture and that the CARDS transaction would have been profitable had this happened. This argument is of no moment. As we previously held, petitioner never intended to finance a new aircraft leasing venture through the CARDS transaction. Therefore, the hypothetical profit potential of such a venture has no bearing on our economic substance analysis.

E. The Loss Lacked Economic Reality.

The ordinary loss claimed from the CARDS transaction was fictional. Petitioner paid $79,244[16] in transaction costs regarding the CARDS transaction and suffered a loss of approximately $72,600, yet Murus reported a $7.6 million tax loss. The claimed loss was purely an artifice of the CARDS transaction. Chenery carefully designed petitioner's CARDS transaction to inflate basis in the loan assumption proceeds substantially beyond their fair market value, thus generating an

---

[16]This amount equals the $29,244 structuring fee to reduce the spread on the loan plus the $50,000 paid for the Pullman & Comley tax opinion.

artificial loss on their disposition. The absence of economic reality is the hallmark of a transaction lacking economic substance. See Blum v. Commissioner, T.C. Memo. 2012-16; see also K2 Trading Ventures, LLC v. United States, 101 Fed. Cl. 365 (2011).

F. The Purported Loan Was Grossly Inefficient.

The CARDS transaction was grossly inefficient as a financing arrangement and made petitioner worse off economically, independent of any investment decision. Respondent's expert, Dr. Lawrence Kolbe, analyzed the CARDS transaction from an economic perspective. His analysis showed that the interest rate on the loan was at least twice the market rate, without fees. Additionally, his analysis showed that the longer the loan was maintained, the worse off petitioner would be economically due to the above-market cost of the loan. Dr. Kolbe concluded that the loan was an unprofitable financing decision and the use of the loan to purchase any investment would create an unnecessary and material drag on the investment's profitability. We find Dr. Kolbe's analysis and conclusions accurate and complete.

In sum, the CARDS transaction lacked economic substance. It was intended to create an ordinary loss that would substantially offset Murus' shared fees income for 2001 and worked exactly as intended. Accordingly, the CARDS transaction

is disregarded for tax purposes and petitioner's claimed loss deduction is disallowed.

## II. Accuracy-Related Penalty

We now turn to respondent's determination that petitioner is liable for an accuracy-related penalty. A taxpayer may be liable for a 20% accuracy-related penalty on the portion of an underpayment of income tax attributable to (1) negligence or disregard of rules or regulations, (2) a substantial understatement of income tax, or (3) a substantial valuation misstatement. Sec. 6662(a) and (b)(1), (2) and (3). The penalty increases to a 40% rate to the extent that the underpayment is attributable to a gross valuation misstatement. Sec. 6662(h)(1). An accuracy-related penalty under section 6662 does not apply to any portion of an underpayment of tax for which a taxpayer had reasonable cause and acted in good faith. Sec. 6664(c)(1).

Respondent determined the 40% accuracy-related penalty applies to any portion of the underpayment related to the disallowed loss deduction for 2001. Petitioner argues that no accuracy-related penalty applies because he meets the reasonable cause exception. We now address whether petitioner is liable for the 40% accuracy-related penalty.

A.  Gross Valuation Misstatement

Respondent determined a 40% accuracy-related penalty for a gross valuation misstatement with respect to the loss reported from the CARDS transaction for 2001.  A taxpayer may be liable for a 40% penalty on that portion of an underpayment of tax that is attributable to one or more gross valuation misstatements.  Sec. 6662(h).  A gross valuation misstatement exists if the value or adjusted basis of any property claimed on a tax return is 400% or more of the amount determined to be the correct amount of such value or adjusted basis.  Sec. 6662(h)(2)(A).  The value or adjusted basis of any property claimed on a tax return that is determined to have a correct value or adjusted basis of zero is considered to be 400% or more of the correct amount.  Sec. 1.6662-5(g), Income Tax Regs.

Our holding that the CARDS transaction lacks economic substance results in the total disallowance of the loss without regard to the value or basis of the property used in the CARDS transaction.  See Leema Enters., Inc. v. Commissioner, T.C. Memo. 1999-18, aff'd sub nom. Keeler v. Commissioner, 243 F.3d 1212 (10th Cir. 2001).  We have held that the gross valuation penalty applies when an underpayment stems from deductions or credits that are disallowed because of lack of economic substance.  See  Palm Canyon X Invs., LLC v. Commissioner, T.C. Memo. 2009-288.  Moreover, the Court of Appeals for the Third Circuit, to which

this case is appealable, has affirmed the gross valuation penalty even when there is a complete disallowance of the underlying tax benefit claimed by the taxpayer. See Merino v. Commissioner, 196 F.3d 147 (3d Cir. 1999), aff'g T.C. Memo. 1997-385. Consequently, the 40% gross valuation misstatement accuracy-related penalty applies to petitioner's underpayment for 2001 absent a showing of reasonable cause or some other defense.

B.  Reasonable Cause and Good Faith

The reasonable and good-faith reliance on the advice of an independent, competent professional as to the tax treatment of an item may negate an accuracy-related penalty. See United States v. Boyle, 469 U.S. 241, 251-252 (1985); sec. 1.6664-4(b), Income Tax Regs. A taxpayer may rely on the advice of a tax professional, such as a lawyer or accountant. Boyle, 469 U.S. at 251.

We consider all facts and circumstances in determining whether a taxpayer has reasonably relied in good faith on professional tax advice. Sec. 1.6664-4(c)(1), Income Tax Regs. The professional advice must be based upon all pertinent facts and circumstances and the law as it relates to those facts and circumstances. Sec. 1.6664-4(c)(1)(i), Income Tax Regs. The advice must consider the taxpayer's purposes for entering into a transaction and for structuring a transaction in a particular manner. Id. The advice cannot be based on unreasonable factual

or legal assumptions and cannot unreasonably rely on the representations, statements, findings or agreements of the taxpayer or any other person. Sec. 1.6664-4(c)(1)(ii), Income Tax Regs. In this regard, the advice must not be based upon a representation or assumption that the taxpayer knows, or has reason to know, is unlikely to be true, such as an inaccurate representation or assumption as to the taxpayer's purposes for entering into a transaction or for structuring a transaction in a particular manner. Id.

Petitioner argues no accuracy-related penalty applies because he reasonably relied in good faith on the Pullman & Comley tax opinion in claiming the loss from the CARDS transaction. We disagree. At least two separate grounds exist to hold that petitioner did not demonstrate reasonable and good-faith reliance on the Pullman & Comley tax opinion. We discuss each in turn.

First, the tax opinion relies on false representations petitioner made. The most crucial of these representations include that (1) petitioner had a business purpose for entering into the CARDS transaction and (2) petitioner anticipated earning a profit, absent tax benefits, from the CARDS transaction. Petitioner knew or should have known that these representations were false. As we previously held, petitioner did not have a valid business purpose or anticipate earning a profit with respect to the CARDS transaction. Moreover, the record as a whole reflects that

petitioner entered into the CARDS transaction for the sole purpose of obtaining a tax loss to offset Murus' shared fees income for 2001. Petitioner's representations to Pullman & Comley are contrary to these facts and part of the subterfuge that was used to create a sense of legitimacy around the intended loss petitioner's CARDS transaction generated. Moreover, the false representations petitioner made were material to the conclusions reached in the tax opinion.

Second, the record does not reflect that petitioner actually relied on the tax opinion. Petitioner received the finalized opinion after the 2001 tax returns for petitioner and Murus were filed. Correspondence indicates that Pullman & Comley sent petitioner a draft of the tax opinion days before those tax returns were filed. Even assuming petitioner received some form of the tax opinion in time to actually rely on it, he cannot establish that the reliance was reasonable and in good faith. There is no draft of the Pullman & Comley tax opinion in the record. Accordingly, petitioner cannot show the factual assumptions and substantive analysis underlying any such draft opinion on which he may have relied and therefore cannot establish any such reliance was reasonable and in good faith. We find petitioner did not reasonably rely in good faith on the Pullman & Comley tax opinion.

Petitioner also argues that the accuracy-related penalty does not apply because he reasonably relied in good faith on the accountants that prepared the tax returns reporting the loss. We are unpersuaded. Petitioner has not shown that the accountants were asked to or did opine on the Federal tax treatment of the loss claimed from the CARDS transaction. Merely because an accountant has prepared a tax return does not mean that he or she has opined on any or all of the items reported on the return. See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 100 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).

Moreover, even assuming the accountants advised petitioner that the loss would be allowed, petitioner has failed to show, among other things, that (1) any such advice was based on all the facts and circumstances, (2) all the relevant facts were disclosed, and (3) any such advice was based on reasonable factual or legal assumptions. We find petitioner did not reasonably rely in good faith on the accountants that prepared the relevant returns for 2001.

We do not otherwise find that petitioner acted with reasonable cause and in good faith with respect to claimed loss from the CARDS transaction. Petitioner is well educated, experienced in business and has been a CPA for over 23 years. Nevertheless, petitioner decided to engage in the CARDS transaction without a business purpose or profit expectation and claimed a loss deduction exceeding

$7.6 million that was artificial and substantially disproportionate to his economic outlay.

In conclusion, we find based on all the facts and circumstances that petitioner failed to establish the reasonable cause and good-faith defense to the accuracy-related penalty.  Accordingly, we sustain respondent's determination that petitioner is liable for the 40% accuracy-related penalty for 2001.

We have considered all remaining arguments the parties made and, to the extent not addressed, we find them to be irrelevant, moot, or meritless.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.